**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ZACHARY JOINER, DANIEL KASSL, and HANWOOK NAM, on Behalf of Themselves and All Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>v.<br><br>NHL ENTERPRISES, INC and NATIONAL HOCKEY LEAGUE,<br><br>                              Defendants. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Zachary Joiner, Daniel Kassl, and Hanwook Nam ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this class action complaint against Defendants NHL Enterprises, Inc. and National Hockey League (collectively "NHL" or "Defendants"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1.     This is a class action brought on behalf of all persons who subscribed to NHL Team Websites[1] operated by or based on Defendants' guidelines, coding, and content.[2]

---

[1] Upon information and belief, the Team Websites at issue include: www.nhl.com/ducks, www.nhl.com/coyotes, www.nhl.com/bruins, www.nhl.com/sabres, www.nhl.com/flames, www.nhl.com/hurricanes, www.nhl.com/blackhawks, www.nhl.com/avalanche, www.nhl.com/bluejackets, www.nhl.com/stars, www.nhl.com/redwings, www.nhl.com/oilers, www.nhl.com/panthers, www.nhl.com/kings, www.nhl.com/wild, www.nhl.com/canadiens, www.nhl.com/predators, www.nhl.com/islanders, www.nhl.com/rangers, www.nhl.com/senators, www.nhl.com/flyers, www.nhl.com/penguins, www.nhl.com/sharks, www.nhl.com/blues, www.nhl.com/lightning, www.nhl.com/mapleleafs, www.nhl.com/canucks, www.nhl.com/capitals, www.nhl.com/jets (collectively, "Team Websites") (the teams are individually referred to as a "Member Team").

[2] "[T]he layouts of their websites are similar in adhering to NHL regulations and guidelines." *See* Echevarria, R. M. (2017). *A Content Analysis of NHL Team Online Branding*. ELON JOURNAL OF UNDERGRADUATE RESEARCH IN COMMUNICATIONS, *8*(2), 96-104 (available at https://www.elon.edu/u/academics/communications/journal/archive/fall-2017/) (last visited March 6, 2023).

2.      The Team Websites provide users with access to video content related to the NHL and the Member Teams, including pre-recorded clips of games, interviews with players and team staff, sports analysts, and more.

3.      On the Team Websites, Defendants offer the option for users to subscribe to the Member Teams' newsletters.  Subscribers are given updates regarding the Member Teams and content on the Team Websites in exchange for their contact information.

4.      Defendants do not disclose on the Team Websites, however, that subscribers' personal identifying information would be captured by the Facebook Pixel utilized by Defendants (referred to as the "Pixel," discussed and defined herein), and then transferred to Facebook.

5.      Data sharing policies for a service or subscription is an important factor for individuals deciding whether to provide personal information to that service.

6.      Congress has recognized the potential harm caused by associating a person's personally identifiable information in conjunction with their video watching.

7.      Congress, therefore, passed the Video Privacy Protection Act ("VPPA"), prohibiting video tape service providers,[3] such as Defendants, from sharing personally identifiable information ("PII") tied to the title, description, or subject matter of pre-recorded audio video material[4] (the "Video Watching Data") without valid consent.[5]

8.      Defendants purposefully implemented and utilized the Pixel, which tracks user activity on the Team Websites and discloses that information to Facebook to gather valuable marketing data.

---

[3] 18 USC 2710(a)(4).
[4] 18 USC 2710(b)(2)(D)(II).
[5] 18 USC 2710.

9.     Defendants do not seek and have not obtained consent from users or subscribers to utilize the Pixel to track, share, and exchange their PII and Video Watching Data with Facebook.

10.     Defendants knew that their Pixel resulted in users' PII and Video Watching Data being shared (resulting in a VPPA violation), and that they failed to obtain users' consent to allow their Pixel to operate in a way that shares users' protected information with Facebook.

11.     Subscribers of the Team Websites have been harmed as a result of Defendants' violations of the VPPA.   In addition to monetary damages, Plaintiffs seek injunctive relief requiring Defendants to immediately (i) remove the Pixel from the Team Websites or (ii) add, and obtain, the appropriate consent from subscribers.

12.     Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons.   Plaintiffs seek relief in this action individually and on behalf of subscribers of the Team Websites for violations of the VPPA, 18 U.S.C. 2710.

## PARTIES

13.     Plaintiff Zachary Joiner is a resident of Illinois.   In or around the year 2021, Mr. Joiner subscribed to NHL's and Chicago Blackhawks' (the "Blackhawks") newsletters.   During the sign-up process, Mr. Joiner was not offered or asked for consent to share his information as a result of, or through, Defendants' Pixel.   Mr. Joiner watched pre-recorded video content on the Blackhawks Website using a device that was signed into Facebook, as recently as a few weeks prior to the filing of this Complaint, resulting in Mr. Joiner's PII and Video Watching Data being shared with Facebook.   Mr. Joiner has not visited or watched videos on the Blackhawk website since February 2023.   Mr. Joiner's Facebook profile included personally identifiable information.

On February 22, 2023, Mr. Joiner served the National Hockey League, as along with the Blackhawks, with pre-suit notice of the VPPA violations alleged herein.

14.    Plaintiff Daniel Kassl is a resident of Illinois.  In or around the year 2019, Mr. Kassl subscribed to Blackhawks' newsletter.  During the sign-up process, Mr. Kassl was not offered or asked for consent to share his information as a result of or through Defendants' Pixel.  Mr. Kassl watched pre-recorded video content on the Blackhawks Website using a device that was signed into Facebook, as recently as February 2023, resulting in Mr. Kassl's PII and Video Watching Data being shared with Facebook.  Mr. Kassl has not visited or watched videos on the site since February 2023.  Mr. Kassl's Facebook profile included personally identifiable information.

15.    Plaintiff Hanwook Nam is a resident of Pennsylvania.  In or around the year 2022, Mr. Nam subscribed to NHL's and Philadelphia Flyers' (the "Flyers") newsletters.  During the sign-up process, Mr. Nam was not offered or asked for consent to share his information as a result of or through Defendants' Pixel.  Mr. Nam subsequently watched pre-recorded video content on the Flyers Website using a device that was signed into Facebook, including specifically during the pre-season of the NHL's 2022-23 season, resulting in Mr. Nam's PII and Video Watching Data being shared with Facebook.  Mr. Nam has not visited the site in the month prior to the filing of this Complaint.  Mr. Nam's Facebook profile included personally identifiable information. On February 22, 2023, Mr. Nam served the National Hockey League, as well as the Flyers, with pre-suit notice of the VPPA violations alleged herein.

16.    Defendant NHL Enterprises, Inc. is a Delaware limited liability company with its principal place of business in New York, New York.  Defendant NHL Enterprises, Inc. operates and promotes professional and semiprofessional clubs and events, including through the development of websites and mobile apps.

4

17.     Defendant National Hockey League is a private corporation headquartered in New York, New York.  Defendant National Hockey League is comprised of 32 franchises.  It is considered a private trade organization, made up of 32 independent corporations – its teams.  In addition to its own website, www.nhl.com, 32 independent Member Team websites cater to fans and visitors of the particular Member Team website (e.g., www.nhl.com/blackhawks; www.nhl.com/flyers; www.nhl.com/rangers), utilizing content derived and hosted by the NHL. The NHL along with each team offers guests of the site the option to sign-up for a team newsletter. The Team Websites also offer a selection of viewable media, including pre-recorded videos.  The Team Websites have utilized Pixel that allows the NHL to transmit subscribers' identifiable information, without the consent of subscriber-users, from the Team Websites to Facebook.

18.     Non-party Chicago Blackhawks is legally registered as Chicago Blackhawks Hockey Team, Inc. in Illinois, with its principal place of business in Chicago, Illinois.  It manages and promotes the Blackhawks professional hockey team participating within the NHL.  As a part of managing the professional hockey team, the Blackhawks have a team website (www.nhl.com/blackhawks) which, in addition to offering visitors the option to subscribe to a team newsletter, offers streaming audio-visual media, articles, and merchandise sales.  The content and coding for the team's website stems from the NHL and, in fact, the pre-recorded video content on the Blackhawks website – which is the subject of the VPPA violations at issue in this litigation – is originated and hosted by the NHL.

19.     Non-party Philadelphia Flyers is legally registered as a fictitious name owned by Comcast Spectacor, LLC in Pennsylvania, with its principal place of business in Philadelphia, Pennsylvania.  It manages and promotes the Flyers professional hockey team participating within the NHL.  As a part of managing the professional hockey team, the Flyers have a team website (www.nhl.com/flyers) which, in addition to offering visitors the option to subscribe to a team

newsletter, offers streaming audio-visual media, articles, and merchandise sales.  The content and coding for the team's website stems from the NHL and, in fact, the pre-recorded video content on the Flyers website – which is the subject of the VPPA violations at issue in this litigation – is originated and hosted by the NHL.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class member is a citizen of a state different from at least one Defendant.

21.    This Court has personal jurisdiction over Defendants because Defendants' principal place of business is in the state of New York.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants' principal place of business is located in this District and Defendants conduct substantial business operations in this District. In connection with the Team Websites, the video content, hosting of media accessible to subscribers, and associated coding, all originate and arise out of the Defendants' business operations in this District.

## COMMON FACTUAL ALLEGATIONS

A.    **Background of the Video Privacy Protection Act**

23.    The VPPA regulates the disclosure of information about consumers' consumption of video content, imposing specific requirements to obtain consumers' consent to such disclosure. Under the statute, for each violation of the statute, a court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

24.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4). The VPPA was initially passed in 1988 for the purpose of protecting the privacy of individuals' video rental, purchase and viewing data.

25.     In 1988, Senators were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audio-visual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

26.     In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

27.     During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy stated that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the

'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[6]

28.     Defendants here are video service providers in that they provided pre-recorded audio-visual materials to Plaintiffs and Class members on their own site (nhl.com) and on the Team Websites.

29.     The relationship between Plaintiffs and Defendants is precisely the type of relationship contemplated by the VPPA.

30.     In this case, Defendants knowingly and systematically disclosed Plaintiffs' personal viewing information to Facebook, without obtaining their consent, by purposely placing the Facebook Pixel on the Team Websites with the knowledge it would collect user information.

**B.     The NHL Utilizes Facebook Pixel to Gather and Transmit PII and Video Watching Data**

31.     Facebook offers the Facebook Pixel (the "Pixel") to web developers for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

32.     A function of the Pixel is to gather, collect and then share user information with Facebook.[7] This information enables Facebook and the web developers to build valuable personal profiles for users, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[8]

---

[6] See Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, https://www.judiciary.senate.gov/download/hearing-transcript_-the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century  (last visited March 6, 2023).
[7] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. (https://developers.facebook.com/docs/meta-pixel/). The Facebook SDK allows websites to access Facebook's social media features and login process, allowing for developers to verify a user's Facebook login status, log users into Facebook when requested, access the Graph API (https://developers.facebook.com/docs/javascript/quickstart/) and deliver user information to the Facebook platform (https://developers.facebook.com/docs/graph-api/overview).
[8] See Meta Pixel, FACEBOOK , https://www.facebook.com/business/tools/meta-pixel (last visited on March 6, 2023).

33.     Web developers and website operators can choose to use the Pixel to share both user activity and user identity with Facebook.

34.     When a Facebook user logs onto Facebook, a "c_user" cookie – which contains a user's non-encrypted Facebook User ID number ("UID") – is automatically created and stored on the user's device for up to a year.[9]

35.     A Facebook UID can be used, by anyone, to easily identify a Facebook user.  Any person, even without in-depth technical expertise, can utilize the UID. Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]). That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

---

[9] *Cookies & other storage technologies*, FACEBOOK, https://www.facebook.com/policy/cookies/ (last visited March 6, 2023).

      **a.**      **The Facebook Pixel as a Tracking Method**

36.    The Facebook Pixel (the "Pixel") tracks user-activity on web pages by monitoring events which,[10] when triggered, causes the Pixel to automatically send data directly to Facebook.[11]

37.    Examples of events utilized by websites are: a user loading a page with (i) "microdata" tags (the "Microdata event"),[12] or (ii) with a Pixel installed (the "PageView event").[13]  The Team Websites utilize both events.[14]

38.    When a PageView and/or Microdata event is triggered, a "HTTP Request" is sent to Facebook (through Facebook's URL www.facebook.com/tr/).[15]  This confirms that the Pixel events sent data to Facebook.

39.    The HTTP Request includes a Request URL, embedded cookies such as the c_user cookie.  It may also include information in its Payload, such as metadata tags.

40.    A Request URL, in addition to a domain name and path, typically contains parameters.  Parameters are values added to a URL to transmit data and direct a web server to provide additional context-sensitive services, as depicted below:

---

[10]     *Meta Business Help Center: About Meta Pixel*, FACEBOOK https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited March 6, 2023).

[11] *See generally Id.*

[12] *Facebook Microdata Installing Schema*, CAT HOWELL https://cathowell.com/facebook-microdata-what-it-is-how-to-set-it-up/ (last visited March 6, 2023).

[13]     *Meta Business Help Center: Specifications for Meta Pixel standard events*, FACEBOOK https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited March 6, 2023).

[14] The presence of Pixel events, such as the Microdata and PageView events, can be confirmed by using the publicly available and free Meta Pixel Helper tool.  *See About the Meta Pixel Helper*, Facebook.com, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited March 6, 2023).

[15] *How We Built a Meta Pixel Inspector*, THE MARKUP https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited March 6, 2023).



41.     *Figure 1 - Mozilla's diagram of a URL, including parameters[16]*

42.     When a Pixel event triggers, the parameters included in a Request URL provide websites and Facebook with additional information about the event being triggered.[17]

43.     The parameters for a Request URL, for instance, may include the title of a video being watched or the URL of the video, as depicted below:

| ▼ General |
| --- |
| **Request URL:** https://www.facebook.com/tr/?id=969549476413549&ev=PageView&dl=https%3A%2F%2Fwww.nhl.com%2Fblackhawks%2Fvide **%2Fblackhawks-fa ll-to-oilers-7-3%2Ft-277437096%** Fc-15003855&rl=https%3A%2F%2Fwww.nhl.com%2Fblackhawks%2Fsearch&if=false&ts=1675189132110&sw=1536&sh=864&v =2.9.95&r=stable&ec=0&o=30&fbp=fb.1.1675168815695.437172811&it=1675189131913&coo=false&rqm=GET |
| **Request Method:** GET |

*Figure 2 - PageView event firing, including video title and URL of video as parameters of Request URL[18]*

44.     While Microdata events can send data through the parameters, often the Microdata event sends its information through the Payload.

45.     Microdata events are triggered whenever a web page containing Microdata tags is loaded.[19]

46.     Microdata tags allow developers to nest metadata within the contents of a web page.[20]

47.     This metadata may include the title of a video – for example, here, "title": "Blackhawks fall to Oilers, 7-3" – on the Blackhawks' website, as depicted below:

---

[16] *What is a URL?*, MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited March 6, 2023).
[17] *Meta for Developers: Conversion Tracking*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited March 6, 2023).
[18] *BLACKHAWKS FALL TO OILERS, 7-3*, CHICAGO BLACKHAWKS https://www.nhl.com/blackhawks/video/blackhawks-fall-to-oilers-7-3/t-277437096/c-15003855 (last visited March 6, 2023).
[19] *Facebook Microdata Installing Schema*, CAT HOWELL https://cathowell.com/facebook-microdata-what-it-is-how-to-set-it-up/ (last visited March 6, 2023).
[20] *Meta for Developers: Microdata Tags*, FACEBOOK https://developers.facebook.com/docs/marketing-api/catalog/guides/microdata-tags/ (last visited March 6, 2023).

*Figure 3 - Microdata Event sends Microdata tag for video's title to Facebook.[21]*

48.    When a Microdata event fires, it sends a request to Facebook containing data, including, but not limited to, the Microdata tags, as depicted in the developer's console viewing the "Payload" above.

49.    When a "c_user" cookie is in place, both the Microdata and PageView event requests include a user's c_user cookie and copy the c_user cookie into the Request header, as depicted below:



*Figure 4 - Embedded c_user cookie in Pixel Request transmitted to Facebook*

---

[21]    *BLACKHAWKS    FALL    TO    OILERS,    7-3*, CHICAGO    BLACKHAWKS https://www.nhl.com/blackhawks/video/blackhawks-fall-to-oilers-7-3/t-277437096/c-15003855 (last visited March 6, 2023).

50.     Both the MicroData and PageView events, when triggered, independently and automatically result in the sharing a user's website interactions (including Video Watching History) and Facebook UID with Facebook.

51.     The Pixel is a marketing tool that must be added by website developers to a website.  A website must link a related Facebook account with its Pixel, and then add code to the website to make use of the Pixel.[22]  Thus, the addition of a Pixel to a website is an affirmative act that must be done purposefully.  The NHL went through these steps to add the Pixel to its website.

52.     Thus PII and Video Watching Data of subscriber-users, including Plaintiffs and Class Members, have automatically been shared with Facebook in a consistent manner across all Team Websites.

**C.     Defendants' Build, Content-Creation, and General Uniformity of the Team Websites**

53.     The National Hockey League is an "organization of professional ice hockey teams in North America, formed in 1917 by four Canadian teams, to which the first U.S. team, the Boston Bruins, was added in 1924." [23] After various periods of expansion and reorganization, the NHL now consists of 32 teams in two conferences and four divisions.[24]

54.     For years, the NHL has promoted professional hockey teams, including promotions and fan engagement through the use of websites bearing the NHL's trademarks to persons and entities throughout the United States. This includes the Team Websites at issue.

55.     The Team Websites are designed to improve marketing outreach and engagement with fans of the Member Teams and act as the official source for NHL and Member Team news.[25]

---

[22]     *How to set up and install a Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited March 6, 2023).
[23]     *National Hockey League*, BRITANNICA https://www.britannica.com/topic/National-Hockey-League (last visited March 6, 2023).
[24]     *Id.*
[25]     *NHL*, www.nhl.com (last visited March 6, 2023).

56.     Defendants work with the Member Teams to operate the Team Websites. What's more, the operability of the Team Websites is reliant on the NHL – e.g., the content available on the sites is managed and hosted by the NHL.

57.     Each Team Website can be navigated to as though it were an individual site, completely separate from other Team Websites.  In practice, however, they all are hosted on the NHL domain,[26] the pre-recorded audio-visual media for the Team Websites are produced by the NHL working with WSC Sports,[27] and the videos are accessed through Team Websites and hosted by the NHL (videos hosted at https://hlslive-wsczoominwestus.med.nhl.com) or its partner WSC Sports (videos hosted at wsczoominwestus.prod-cdn.clipro.tv).

58.     The NHL and WSC Sports can be confirmed as the video hosts by inspecting the video player code on the team website via the developer's console, as depicted below:



---

[26] *See Fn. 1.*

[27] WSC Sports partners with hundreds of sports organizations to streamline their video production flow, increase reach, and provide "new monetization opportunities" using an AI cloud platform that helps generate customized sports videos.  This includes the NHL.  *See* WSC SPORTS, https://wsc-sports.com/ (last visited March 6, 2023).

[28] *BLACKHAWKS FALL TO OILERS, 7-3,* CHICAGO BLACKHAWKS https://www.nhl.com/blackhawks/video/blackhawks-fall-to-oilers-7-3/t-277437096/c-15003855 (last visited March 6, 2023).

59.    The code shown in the developer's console is only a portion of the operating code. To see the complete section of code, the content is entered and viewed in a text editor. When viewed in a text editor, a direct video to the link becomes viewable (here, https://hlslive-wsczoominwestus.med.nhl.com/publish/9076723/14670214/17507dc3-8462-4bab-8aa0-f7370c93b6c1.mp4), as depicted below:



60.    This link, which includes references to WSC Sports and NHL, leads to a webpage with the same video, as depicted below:

*Figure 5 - Source of Team Website Video[29]*

61.    Meaning, when the Team Websites are visited by a user, the Team Websites request the assets from the NHL, which are subsequently loaded to users' computers.

---

[29] https://hlslive-wsczoominwestus.med.nhl.com/publish/9076723/14670214/17507dc3-8462-4bab-8aa0-f7370c93b6c1.mp4 (last visited March 6, 2023).

62.     The Team Websites cannot deliver or load assets, including videos or images, to users without the NHL's , content development, management and hosting for the Team Websites.

**D.     Defendants Shared Plaintiffs' PII and Video Watching Data in Violation of the VPPA**

63.     Defendants violate the VPPA through its use of the Pixel – specifically, tracking by and through Facebook – on its Teams Websites.

64.     The Pixel allow Defendants to share a user's website usage data with Facebook, in conjunction with the user's Facebook UID, which allows for Facebook to develop better targeted advertising, among other business functions.

65.     Defendants' Team Websites implement the Pixel which track Video Watching Data by identifying the name and location (via URL) of specific video content watched by Plaintiffs and Class Members, as well as the Plaintiffs' and Class Members' PII in the form of the Facebook UID through their c_user cookies.

66.     Below is a sample detailing how Defendants violate the VPPA on the Chicago Blackhawks website, through their use of the Pixel.  Defendants also violate the VPPA on the remaining Team Websites using the Pixel. Information pertaining to Defendants' like violations of the VPPA as applied to the remaining Team Websites is included in Exhibit A, attached hereto.

**a.     The NHL, By Way of Example, Tracks Plaintiffs' Video Watching History and PII on the Philadelphia Flyers Website and Transmits the Data to Facebook**

67.     Akin to each of the Team Websites, the Philadelphia Flyers (the "Flyers") website implements the Pixel.

68.     The Flyers website, during the relevant period, utilized the Pixel.

69.     The Flyers website's use of the Pixel events were, and are, in violation of the VPPA.

70.    The Flyers website's use of the Pixel is depicted by:



*Figure 6 - Pixel events are active and confirmed by Facebook Pixel Helper*[30]

71.    The NHL utilized the same Pixel events for other Team Websites during the relevant time period.  A sampling of the Team Websites' identical use of the Pixel is reflected in Exhibit A (attached).

72.    The Flyers website uses the Pixel to capture Plaintiffs' and Class Members' Facebook UID in the form of the c_user cookie, as described above in paragraphs 50 and 64.

73.    The NHL uses the Pixel to share the video watching data in two ways: (i) through the Request URL parameters described above in paragraphs 39 through 43 and paragraphs 49

---

[30]    *POSTGAME 5: Penalties Costly in 5-2 Loss in Tampa*, Chicago Blackhawks https://www.nhl.com/flyers/news/postgame-5-penalties-costly-in-5-2-loss-in-tampa--philadelphia-flyers/c-341974458 (last visited March 6, 2022).

through 50; and (ii) through the Microdata tags shown to be active in paragraphs 44 through 48 and paragraphs 49 through 50, which tracks, among other data, the title of the video.

74.     The Pixel's use of Request URL parameters to share the video title and URL of the location of the video is confirmed by using the developer's console to monitor the requests made by the Flyers' website to Facebook, as depicted by:



*Figure 7 - Flyers' Use of Pixel PageView event to share video watching data through URL parameters[31]*

75.     The same process utilizing the Pixel's Request URL, was implemented by the NHL for its Team Websites.  A sampling of the Team Websites' identical use of the request process is reflected in Exhibit A (attached).

76.     The Pixel PageView event uses Request URL to share the Video Watching Data to Facebook.

77.     The Pixel Microdata event may use a Request URL or the Payload to send the Video Watching Data and URL of the location of the video.

---

[31]     *1/28 Postgame: Tippett*, CHICAGO BLACKHAWKS,  https://www.nhl.com/flyers/video/128-postgame-tippett/t-277437426/c-15000574 (last visited March 6, 2022).

78.    The Microdata event's use of the Payload to share the Video Watching Data is confirmed by using the developer's console to monitor the requests made by the Flyers' website to Facebook, as depicted by:



*Figure 8 - Flyers' Use of Pixel Microdata to share Video Watching Data through Payload[32]*

79.    The NHL's sharing of Class Members' Facebook UID occurs in a consistent manner across the Pixel events (PageView and Microdata), resulting when an active c_user cookie exists on a device used to load the Flyers website, allowing the NHL to include the user's Facebook UID in its request header to Facebook.   This process is confirmed by using the developer's console to monitor the Flyers website requests to Facebook, as depicted by:

---

[32] *Id.*

*Figure 9 - Facebook Pixel Request (PageView) sent to Facebook include embedded c_user cookie[33]*

80.     The transmission of active c_user cookies follows the same, consistent, approach by the NHL for its Team Websites.   A sampling of the Team Websites' c_user cookie transmission is reflected in Exhibit A (attached).

81.     Both Microdata and PageView Pixel events send the collected information from the Flyers website to Facebook when triggered.

82.     When the Microdata event triggers on the Flyers website, the PII and video title are sent to Facebook through an automatic request made or delivered to www.facebook.com/tr/, as verified in paragraph 78 through 79, Figures 8 and 9, and through the developer's console depicted below:

---

[33] *Id.*



*Figure 10 - Flyers's use of Microdata request to send PII and Video Watching Data to Facebook*[34]

83.    When the "PageView" event triggers on the Flyers website, the video title and PII

are sent to Facebook through a request made to www.facebook.com/tr/, as verified in paragraph 74,

Figure 7 and through the developer's console depicted below:



*Figure 11 - Flyers' PageView event sends information to facebook.com/tr/* [35]

**b.    The NHL, By Way of Example, Tracks Plaintiffs' Video Watching History and PII on the Chicago Blackhawks Website and Transmits the Data to Facebook**

84.    Akin to each of the Team Websites, the Chicago Blackhawks (the "Blackhawks") website implements the Pixel.

85.    The Blackhawks website, during the relevant period, utilized the Pixel.

86.    The Blackhawks website's use of the Pixel events were, and are, in violation of the VPPA.

87.    The Blackhawks website's use of the Pixel is depicted by:

---

[35] *Id.*



*Figure 12 - Pixel events are active and confirmed by Facebook Pixel Helper[36]*

88.     The NHL utilized the same Pixel events for other Team Websites during the relevant time period.  A sampling of the Team Websites' identical use of the Pixel is reflected in Exhibit A (attached).

89.     The Blackhawks website uses the Pixel to capture Plaintiffs' and Class Members' Facebook UID in the form of the c_user cookie, as described above in paragraphs 50 and 64.

90.     The NHL uses the Pixel to share the video watching data in two ways: (i) through the Request URL parameters described above in paragraphs 39 through 43 and paragraphs 49 through 50; and (ii) through the Microdata tags shown to be active in paragraphs 45 through 49 and paragraphs 50 through 51, which tracks, among other data, the title of the video.

91.     The Pixel's use of Request URL parameters to share the video title and URL of the location of the video is confirmed by using the developer's console to monitor the requests made by the Blackhawks' website to Facebook, as depicted by:

---

[36] CHICAGO BLACKHAWKS, www.nhl.com/blackhawks (last visited March 6, 2022).



*Figure 13 - Blackhawks' Use of Pixel PageView event to share Video Watching Data through URL parameters[37]*

92.     The same process utilizing the Pixel's Request URL, was implemented by the NHL for its Team Websites.  A sampling of the Team Websites' identical use of the request process is reflected in Exhibit A (attached).

93.     The Pixel PageView event uses Request URL to share the Video Watching Data to Facebook.

94.     The Pixel Microdata event may use a Request URL or the Payload to send the Video Watching Data and URL of the location of the video.

95.     The Microdata event's use of the Payload to share the Video Watching Data is confirmed by using the developer's console to monitor the requests made by the Blackhawks' website to Facebook, as depicted by:

---

[37]     *BLACKHAWKS     FALL     TO     OILERS,     7-3,* Chicago     Blackhawks https://www.nhl.com/blackhawks/video/blackhawks-fall-to-oilers-7-3/t-277437096/c-15003855 (last visited March 6, 2023).



*Figure 14 - Blackhawks' Use of Pixel Microdata to share Video Watching Data through Payload[38]*

96.     The NHL's sharing of Class Members' Facebook UID occurs in a consistent manner across the Pixel events (PageView and Microdata), resulting when an active c_user cookie exists on a device used to load the Blackhawks website, allowing the NHL to include the user's Facebook UID in its request header to Facebook.   This process is confirmed by using the developer's console to monitor the Blackhawks website requests to Facebook, as depicted by:

*Figure 15 - Facebook Pixel Request (Microdata) sent to Facebook include embedded c_user cookie[39]*

---

[38] *Id.*
[39] *Id.*

97.     The transmission of active c_user cookies follows the same, consistent, approach by the NHL for its Team Websites.  A sampling of the Team Websites' c_user cookie transmission is reflected in Exhibit A (attached).

98.     Both Microdata and PageView Pixel events send the collected information from the Blackhawks website to Facebook when triggered.

99.     When the Microdata event triggers on the Blackhawks website, the PII and video title are sent to Facebook through an automatic request made or delivered to www.facebook.com/tr/, as verified in paragraph 95 and 96, Figure 14 and 15.

100.    When the "PageView" event triggers on the Blackhawks website, the video title and PII are sent to Facebook through a request made to www.facebook.com/tr/, as verified in paragraph 91, Figure 13.

101.    All of the Team Websites employed the practice of having subscribers' PII and video titles sent to Facebook through an automatic request made or delivered to www.facebook.com/tr/.

102.    When the Microdata or PageView event triggers (or both), the Facebook UID and title of the video is automatically sent to Facebook.

**E.     Sign-up for the Member Team Newsletters Lack Informed, Written Consent**

103.    The Team Websites do not seek nor obtain permission from their subscribers, including Plaintiffs and the Class, to share the subscribers' PII or video watching information with third-parties, including Facebook.

104.    The sign-up processes for the Team Websites' newsletters do not seek or obtain informed, written consent.

105.    To the extent information about any of the NHL's Team Website's data sharing can be located, the language (i) is not presented to users of the site in a transparent manner; (ii) is

not made available as part of the sign-up process; (iii) is not offered to users as checkbox or e-signature field, or as any form of consent; and (iv) does not include terms that sufficiently warn users that their information, protected by the VPPA, will be shared with a third party.

106.    The team websites include newsletter sign-ups with consistent language and formats. By way of example, the sign-up forms for the non-party teams appear as:

a.    **Philadelphia Flyers**[40]



---

[40] *Flyerwire Signup*, PHILADELPHIA FLYERS, https://www.nhl.com/flyers/multimedia/flyerwire-signup (last visited March 6, 2023).

b.        **Chicago Blackhawks**[41]



**F.      Plaintiffs Did Not Consent to Defendants' sharing of Plaintiffs' PII and Video Watching Data**

107.      The VPPA sets out guidelines as to the forms of consent that consumers can give to video tape service providers to share consumers' information.

108.      The VPPA limits video tape service providers' ability to share consumers' PII with third-parties, except where consumers provide "informed, written consent (including through an electronic means using the Internet) . . . in a form that is distinct and separate from any form setting forth other legal or financial obligations of the consumers."[42]

109.      Such consent must be at the election of consumers, and consumers must be clearly and conspicuously provided with an opportunity to withdraw consent from ongoing disclosures on a case-by-case basis.[43]

110.      While limited information regarding consumers can be shared (e.g., name and address) to third parties, this exemption only applies where video tape service providers give the consumer a clear and conspicuous opportunity to prohibit this disclosure and the disclosure does not identify the title, description, or subject matter of the audio-visual material.[44]

111.      Plaintiffs and Class Members did not consent to Defendants' Pixel pursuant to the VPPA, as Plaintiffs were not asked to provide informed, written consent in a form a separate from other legal obligations.

112.      Additionally, Plaintiffs and Class Members are not given the opportunity to withdraw consent from ongoing disclosures on a case-by-case basis.

113.      Finally, Defendants provide titles, descriptions, or subject matter of audio-visual materials when sharing Plaintiffs' and Class Members' PII.

---

[42] 18 USC 2710(b)(2)(B); 18 USC 2710(b)(2)(B)(i).
[43] 18 USC 2710(b)(2)(B)(ii); 18 USC 2710(b)(2)(B)(iii).
[44] 18 USC 2710(b)(2)(D)

## CLASS ACTION ALLEGATIONS

114.    Plaintiffs bring this action individually and on behalf of the following Class:

> All persons in the United States with a subscription to an NHL-owned website, including the Team Websites, that had their personal information improperly disclosed to Facebook through the use of the Pixel (the "Class").

115.    Specifically excluded from the Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

116.    Plaintiffs reserve the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

117.    This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

118.    Numerosity (Rule 23(a)(1)): At this time, Plaintiffs do not know the exact number of members of the aforementioned Class. However, given the popularity of Defendants' Team Websites, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

119.    Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, subscribed to, and used, a Team Website to watch videos, and had their PII collected and disclosed by Defendants.

120.   <u>Adequacy of Representation (Rule 23(a)(4))</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class.   Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

121.   <u>Superiority (Rule 23(b)(3))</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the monetary damages suffered by individual Class members is relatively small, the expense and burden of individual litigation make it impossible for individual Class members to seek redress for the wrongful conduct asserted herein.  If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

122.   <u>Commonality and Predominance (Rule 23(a)(2), 23(b)(3))</u>: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

  a.   Whether Defendants collected Plaintiffs' and the Class's PII and Video Watching Data;

  b.   Whether Defendants unlawfully disclosed and continues to disclose the PII and Video Watching Data of subscribers of the Team Websites in violation of the VPPA;

  c.   Whether Defendants' disclosures were committed knowingly; and

  d.   Whether Defendants disclosed Plaintiffs' and the Class's PII and Video Watching Data without consent.

123.　Information concerning Defendants' Team Websites data sharing practices and subscription members are available from Defendants' or third-party records.

124.　Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

125.　The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications, and establish incompatible standards of conduct for Defendants.　Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

126.　Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

127.　Given that Defendants' conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## COUNT I

**VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT**
**18 U.S.C. § 2710, *et seq*.**
**(On Behalf of Plaintiffs and the Class)**

128.　Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

129.　Plaintiffs bring this count on behalf of themselves and all members of the Class.

130.　The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

131.   Defendants violated this statute by knowingly disclosing Plaintiffs' and other Class members' personally identifiable information to Facebook.

132.   Defendants, through the Team Websites, engage in the business of delivering video content to subscribers, including Plaintiffs and the other Class members, and other users. The Team Websites deliver videos to subscribers, including Plaintiffs and the other Class members, by making those materials electronically available to Plaintiffs and the other Class members on the Team Websites.

133.   "Personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

134.   A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

135.   Defendants are "video tape service providers" because they create, host, and deliver hundreds of videos on its websites, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

136.   Defendants also solicit individuals to subscribe to the Member Team newsletters that advertise and promote videos and articles on the Team Websites.

137.   Plaintiffs and members of the Class are "consumers" because they subscribed to the Member Teams' newsletters. 18 U.S.C. § 2710(a)(1).

138.   Plaintiffs and the Class members viewed video clips using the Team Websites.

139.   Defendants disclosed to Facebook Plaintiffs' and the Class members' personally identifiable information. Defendants utilized the Pixel to force Plaintiffs' web browser to transfer

Plaintiffs' identifying information, like their Facebook ID, along with Plaintiffs' event data, like the title of the videos they viewed.

140.     Defendants knowingly disclosed Plaintiffs' PII, which is triggered automatically through Defendants' use of the Pixel.  No additional steps on the part of the Defendants, Facebook or any third-party is required.  And, once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]).  That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

141.     The VPPA provides that a videotape service provider may disclose personally identifiable information concerning a consumer as long as that person has provided "informed written consent . . . in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(A)(i).

142.     Plaintiffs and Class members did not provide Defendants with any form of consent—either written or otherwise—to disclose their PII to third parties.  Defendants (and the Member Teams themselves), however, failed to obtain "informed, written consent" from subscribers – including Plaintiffs and Class members – "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is soon." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

143.     Defendants' disclosure of Plaintiffs' and Class Members' Video Watching Data and PII was not made in the "ordinary course of business" as the term is defined by the VPPA. In

particular, Defendants' disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

144.    In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendants failed to provide an opportunity to opt out as required by the VPPA.

145.    On behalf of themselves and the Class, Plaintiffs seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendants to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

(a)    For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

(b)    For an order declaring the Defendants' conduct violates the statute referenced herein;

(c)    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)    Entry of an order for injunctive and declaratory relief as described herein, including. But not limited to requiring Defendants to immediately (i) remove the Pixel from the Team Websites or (ii) add, and obtain, the appropriate consent from subscribers;

(e)      For damages in amounts to be determined by the Court and/or jury;

(f)      An award of statutory damages or penalties to the extent available;

(g)      For Defendants to pay $2,500.00 to Plaintiffs and each Class member, as provided

by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(h)      For pre-judgment interest on all amounts awarded;

(i)      For an order of restitution and all other forms of monetary relief;

(j)      An award of all reasonable attorneys' fees and costs and

(k)      Such other and further relief as the Court deems necessary and appropriate.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs demand a trial by jury of all issues so triable.


Dated: March 10, 2023                    **LEVI & KORSINSKY, LLP**

By: *s/ DRAFT*
Mark S. Reich (MR-4166)
Courtney E. Maccarone (CM-5863)
Gary I. Ishimoto (*pro hac vice* to be filed)
55 Broadway, 10th Floor
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Emails: mreich@zlk.com
            cmaccarone@zlk.com
            gishimoto@zlk.com

*Counsel for Plaintiffs*


36