**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ZACHARY JOINER, DANIEL KASSL, and HANWOOK NAM, on Behalf of Themselves and All Others Similarly Situated,<br><br>               Plaintiffs,<br><br>v.<br><br>NHL ENTERPRISES, INC. and NATIONAL HOCKEY LEAGUE,<br><br>               Defendants. | Case No. 1:23-cv-02083-LAK |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANTS' MOTION TO DISMISS THE COMPLAINT</u>**

HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
(212) 513-3200

*Attorneys for Defendants NHL Enterprises,*
*Inc. and National Hockey League*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ..................................................................................1

FACTUAL BACKGROUND......................................................................................4

LEGAL STANDARD.................................................................................................6

ARGUMENT ..............................................................................................................8

    I.    Plaintiffs Lack Article III Standing Because They Have Not Suffered a Concrete Harm and Therefore Have Not Established an Injury in Fact. ..................8

        A.    Mere Alleged Violations of the VPPA Without Allegations of Concrete Harm Are Insufficient to Confer Standing........................................................9

        B.    Plaintiff Joiner Lacks Standing for the Additional Reason that, Contrary to His Allegations, He Did Not Subscribe to a Newsletter on the Blackhawks Website. .........................................................................................11

    II.    Under a Rule 12(b)(6) Standard, Plaintiffs Fail to State a Claim Under the VPPA. .............................................................................................................12

        A.    Plaintiffs Do Not Plausibly Allege that They Are "Consumers."..................12

        B.    Plaintiffs Do Not Plausibly Allege that the NHL Is a "Video Tape Service Provider." ...........................................................................................15

        C.    Plaintiffs Do Not Plausibly Allege that the NHL Disclosed Their PII. .........16

            1.    Plaintiffs Fail to Plausibly Allege that the NHL Disclosed the Plaintiffs' Identities Because the c_user Cookie Would Not Readily Permit an Ordinary Person to Identify the Plaintiffs. ...........17

            2.    Plaintiffs Fail to Plausibly Allege that the NHL Disclosed the Identity of Specific Video Materials That Plaintiffs "Requested or Obtained." ....................................................................................18

            3.    The NHL Never Possessed—Let Alone Disclosed—Plaintiffs' c_user Cookies or Facebook IDs.......................................................19

        D.    Plaintiffs Do Not Plausibly Allege that the NHL "Knowingly" Disclosed Their PII. .......................................................................................20

CONCLUSION.........................................................................................................21

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aponte v. Ne. Radiology, P.C.*,
 No. 21 CV 5883 (VB), 2022 WL 1556043 (S.D.N.Y. May 16, 2022)...................................10

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)......................................................................................................7, 16, 20

*Austin-Spearman v. AMC Network Entertainment LLC*,
 98 F. Supp. 3d 662 (S.D.N.Y. 2015).................................................................................14, 15

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)...............................................................................................................7

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
 17-CV-04570 (LAK) (KHP), 2017 WL 3727230 (S.D.N.Y. Aug. 11, 2017)..................17, 20

*Carter v. HealthPort Techs., LLC*,
 822 F.3d 47 (2d Cir. 2016)......................................................................................................7

*Carter v. Scripps Networks, LLC*,
 No. 22-cv-2031-PKC, 2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023) .....................2, 12, 13, 14

*Cavazzini v. MRS Assocs.*,
 574 F. Supp. 3d 134 (E.D.N.Y. 2021) ...................................................................................10

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
 747 F.3d 145 (2d Cir. 2014)...............................................................................................7, 19

*Eichenberger v. ESPN, Inc.*,
 876 F.3d 979 (9th Cir. 2017) ................................................................................................19

*Ellis v. Cartoon Network, Inc.*,
 803 F.3d 1251 (11th Cir. 2015) ............................................................................................15

*Fernandez v. Zoni Language Cntrs., Inc.*,
 No. 15-cv-6066 (PKC), 2016 WL 2903274 (S.D.N.Y. May 18, 2016)....................................6

*Holland v. JPMorgan Chase Bank, N.A.*,
 No. 19 CIV. 00233 (PAE), 2019 WL 4054834 (S.D.N.Y. Aug. 28, 2019).........................7, 12

*In re Hulu Priv. Litig.*,
 86 F. Supp. 3d 1090 (N.D. Cal. 2015) .............................................................................16, 20

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*,
    48 F.4th 1236 (11th Cir. 2022) ........................................................................9

*Katz v. Donna Karan Co., L.L.C.*,
    872 F.3d 114 (2d Cir. 2017)..........................................................................6, 7

*Kola v. Forster & Garbus LLP*,
    No. 19-CV-10496, 2021 WL 4135153 (S.D.N.Y. Sept. 10, 2021)...........................9

*Krys v. Pigott*,
    749 F.3d 117 (2d Cir. 2014)............................................................................8

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004)........................................................................................12

*Maddox v. Bank of New York Mellon Tr. Co.*,
    N.A., 19 F.4th 58, 64 (2d Cir. 2021)...............................................................8

*Martin v. Meredith Corp.*,
    No. 22CV4776 (DLC), --- F. Supp. 3d ---, 2023 WL 2118074 (S.D.N.Y. Feb.
    17, 2023) ..................................................................................6, 17, 18, 19

*Mollett v. Netflix, Inc.*,
    No. 5:11-CV-01629-EJD, 2012 WL 3731542 (N.D. Cal. Aug. 17, 2012) .............20

*In re Nickelodeon Consumer Priv. Litig.*,
    827 F.3d 262 (3d Cir. 2016)...............................................................1, 15, 17

*Passariello v. The Atlantic Monthly Group LLC*,
    2:22-cv-08993-JLS-AFM, Dkt. No. 34 (C.D. Cal. May 23, 2023) ......................11

*Poodry v. Tonawanda Band of Seneca Indians*,
    85 F.3d 874 (2d Cir. 1996)............................................................................7

*Raines v. Byrd*,
    521 U.S. 811 (1997).....................................................................................8

*Robinson v. Disney Online*,
    152 F. Supp. 3d 176 (S.D.N.Y. 2015)............................................................19

*Scottrade, Inc. v. BroCo Invs., Inc.*,
    774 F. Supp. 2d 573 (S.D.N.Y. 2011)............................................................12

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016).....................................................................................8

*Sputz v. Alltran Fin., LP*,
    No. 21-CV-4663 (CS), 2021 WL 5772033 (S.D.N.Y. Dec. 5, 2021)....................10

iii

*Sterk v. Best Buy Stores, L.P.*,
   No. 11 C 1894, 2012 WL 5197901 (N.D. Ill. Oct. 17, 2012) .................................................11

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ....................................................................................*2,* 8, 9, 10, 11

*In re Vizio, Inc., Consumer Priv. Litig.*,
   238 F. Supp. 3d 1204 (C.D. Cal. 2017) ..............................................................................15

*Wilson v. Triller, Inc.*,
   598 F. Supp. 3d 82 (S.D.N.Y. 2022) ...................................................................................16

## Constitutional Provisions

U.S. Const., Art. III, § 2 ...........................................................................................2, 8, 11

## Statutes

10 U.S.C. § 949p-5 ........................................................................................................20

15 U.S.C. § 6821 ...........................................................................................................20

Federal Rule of Civil Procedure Rule 12(b)(1)...................................................... *passim*

Federal Rule of Civil Procedure Rule 12(b)(6).......................................................*passim*

Video Privacy Protection Act, 18 U.S.C. § 2710 ................................................... *passim*

## Other Authorities

Restatement (Second) of Torts § 652A (1977) .............................................................9

Restatement (Second) of Torts § 652D (1977). ...........................................................10

Senate Report on the VPPA,
   S. Rep. No. 100-599 (1988), reprinted in 1988 U.S.C.C.A.N. 4342-1 ..............................13, 15

Defendants NHL Enterprises, Inc. and National Hockey League (collectively, the "NHL") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiffs' Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This case is part of a recent deluge of putative class action lawsuits attempting to stretch the Video Privacy Protection Act, 18 U.S.C. § 2710 (the "VPPA" or "Act") well beyond its plain language and intended limits.  Despite the fact that Congress's purpose in passing the Act was "quite narrow" (*In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 284 (3d Cir. 2016)), the lawsuits seek to enforce the Act against long-accepted digital marketing practices in order to rake in supposedly "automatic" damage awards.  As the Third Circuit explained, Congress passed the Act in direct response to a newspaper's publication of Supreme Court nominee Robert Bork's video rental history and did not intend "to cover factual circumstances far removed from those that motivated its passage."  *Id.* at 278, 284.

Consistent with the Act's history, the VPPA permits a "consumer" (defined as a "renter, purchaser, or subscriber of goods or services from a video tape service provider") to assert a claim against a "video tape service provider" (defined as a person "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials") that "knowingly" discloses to third parties the consumer's "personally identifiable information" (defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider").  18 U.S.C. § 2710.

Plaintiffs' theory in this case is that placement of the Facebook Pixel (the "Pixel") on the websites of NHL member teams ("Member Teams") gave rise to VPPA violations.  However, Plaintiffs' Complaint is subject to dismissal on numerous, independently-sufficient grounds.

As a threshold matter, Plaintiffs' Complaint should be dismissed pursuant to Rule 12(b)(1) because Plaintiffs have not suffered an injury in fact and, thus, lack standing to sue under Article III of the United States Constitution. The sole injury that Plaintiffs allege is the purported violation of a legal right allegedly conferred by the VPPA; however, under *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2215 (2021), bare allegations of statutory violations, without a demonstrated concrete harm, are insufficient to confer standing.

Plaintiff Zachary Joiner lacks standing to sue for another reason as well—the evidence submitted herewith demonstrates that he is not a "consumer" as defined by the VPPA. In asserting that Joiner is a consumer, the Complaint relies on an allegation that he signed up for a newsletter on the Chicago Blackhawks website; however, the accompanying Declaration of Matt Gray, Vice President of Strategy & Analytics at the Chicago Blackhawks, conclusively refutes that allegation, negating any claim of standing. Joiner's claim fails under Rule 12(b)(1) on this alternate basis.

Further, proceeding under a Rule 12(b)(6) standard, Plaintiffs' Complaint fails to state a claim upon which relief can be granted for several independent reasons. Namely, Plaintiffs fail to plausibly allege, under the VPPA, that (1) they are "consumers"; (2) the NHL is a "video tape service provider"; (3) the NHL actually disclosed Plaintiffs' personally identifiable information ("PII"); or (4) even if Plaintiff had successfully alleged that the NHL disclosed Plaintiffs' PII, the disclosure was a "knowing" disclosure.

First, Plaintiffs do not plausibly allege that they are "consumers" under the VPPA. As a recent decision from this District explains, the VPPA "provides for an action by a renter, purchaser [or] subscriber of <u>audio visual materials</u>, and not a broader category of consumers." *Carter v. Scripps Networks, LLC*, No. 22-cv-2031-PKC, 2023 WL 3061858, at *6 (S.D.N.Y. Apr. 24, 2023) (emphasis added). Here, Plaintiffs allege that "they subscribed to the Member Teams' newsletters"

(Compl ¶ 137), but they do <u>not</u> allege that the newsletter subscriptions were required to access the videos at issue (they were not) or that they enhanced or otherwise affected their viewing experience (they did not).  In other words, even accepting their allegations as true, Plaintiffs allege that they were subscribers to newsletters, not subscribers to audio visual materials as required to state a claim under the VPPA.

Second, Plaintiffs do not plausibly allege that the NHL, a professional ice hockey league, is a "video tape service provider," i.e., that "delivery of prerecorded video cassette tapes or similar audio visual materials" is a focus of the NHL's work, as required by the VPPA and relevant case law.

Third, Plaintiffs do not adequately allege that the NHL disclosed their PII because (i) the facts as set forth in the Complaint do not allege that the Pixel sent Facebook information about "specific video materials or services" that Plaintiffs "requested or obtained," (ii) the information allegedly disclosed would <u>not</u> readily permit an ordinary person to identify the Plaintiffs, and (iii) if Plaintiffs' allegations in their own Complaint are true—i.e., that the cookie files in question were created and placed by Facebook and not the NHL and were sent by Plaintiffs' own browsers and not the NHL—then it is readily apparent (without the need for wasteful discovery) that the NHL cannot have unlawfully disclosed what it never possessed.

Fourth, even if Plaintiffs had adequately alleged that the NHL disclosed Plaintiffs' PII (which they do not), they do not plausibly allege that the NHL had the requisite, actual knowledge of that disclosure to be held statutorily accountable.

Therefore, the Complaint should be dismissed in its entirety.[1]

---

[1] NHL.com's current Terms of Service, which became effective on March 8, 2023, contain both an arbitration clause and a class action waiver.  *See* Terms of Use, https://www.nhl.com/info/terms-of-service (last updated March 8, 2023).  NHL.com users were provided explicit notice of the updated terms through multiple methods (e.g., email, interstitial banners, static banners, and cookie banners) and were advised that their continued use of the website would

### FACTUAL BACKGROUND[2]

**The Defendants.**  The National Hockey League is an "organization of professional ice hockey teams in North America," consisting of 32 independent Member Teams.  Compl., ¶ 53.  According to the Complaint, NHL Enterprises, Inc. "operates and promotes professional and semiprofessional clubs and events."  *Id.* ¶ 16.

**The Team Websites.**  Plaintiffs allege that the "Defendants work with the Member Teams to operate the Team Websites," that "cater to fans and visitors of the particular Member Team Website . . . utilizing content derived and hosted by the NHL."  *Id.*, ¶¶ 17, 56.  "The Team Websites are designed to improve marketing outreach and engagement with fans of the Member Teams and act as the official source for NHL and Member Team news."  *Id.*, ¶¶ 55-56.  They "offer[] streaming audio-visual media, articles, and merchandise sales."  *Id.*, ¶¶ 17-18; *see also* Declaration of Matt Gray, dated June 16, 2023 ("Gray Decl."), ¶ 2 (explaining that the Chicago Blackhawks website "provides users with news, analysis, statistics, articles, videos, and other content and information related to the Blackhawks").

**The Newsletters.**  According to the Complaint, "[t]he NHL along with each team offers guests of the site the option to sign-up for a team newsletter," to "[s]tay up to date with all the latest [Member Team] information" and "[r]eceive exclusive presales, breaking news, event updates and special offers."  Compl., ¶¶ 17, 106 (alleging that "[t]he team websites include

---

constitute acceptance of the updated terms.  Plaintiffs filed this lawsuit on March 10, 2023, after the updated terms became effective, but they have attempted to plead around the updated terms by alleging that they did not access the website in the days before they filed the Complaint.  *See, e.g.,* Compl. ¶ 13 ("Mr. Joiner has not visited or watched videos on the Blackhawk website since February 2023.");  *see also id.* ¶¶ 14-15.  In light of that artful pleading, the current motion will not address arbitration or class action waiver arguments; however, the NHL explicitly reserves the right to assert all arguments related to whether Plaintiffs and/or prospective class members consented to arbitration or agreed to a class-waiver (whether through the current Terms of Service or through the prior version of the Terms of Service, which also included an arbitration provision and class action waiver), after appropriate discovery.

[2] Unless otherwise indicated, all facts are drawn from the Complaint and are accepted as true solely for purposes of the NHL's Rule 12(b)(6) arguments.

newsletter sign-up with consistent language" and excerpting an alleged screenshot of the Philadelphia Flyers newsletter page). Plaintiffs do <u>not</u> allege that a newsletter subscription was required to access—or in any way increased the availability of, enhanced or otherwise affected Plaintiffs' viewing experience of—the videos on the Team Websites. Rather, the Complaint is explicit that the Team Websites offer the newsletter subscription "in addition to" the streaming audio-visual media in question. Compl., ¶¶ 18-19; *see also* Gray Decl., ¶ 5 ("Signing up for a newsletter does <u>not</u> function as a log-in on the Website and is <u>not</u> required to access or view videos on the Website—the same videos are available on the Website whether or not a user has signed-up for a Newsletter. Signing up for a Newsletter does not enhance or in any way affect a Website user's video viewing experience.").

  *The Alleged Subscriptions.* Plaintiffs allege that they subscribed to certain Member Teams' newsletters. *Id.*, ¶ 137. Specifically, Plaintiff Hanwook Nam allegedly subscribed to a Philadelphia Flyers newsletter, and Plaintiffs Zachary Joiner and Daniel Kassl allegedly subscribed to a Chicago Blackhawks newsletter. *Id.*, ¶¶ 13-15 (alleging that Joiner subscribed "in or around the year 2021" and that Kassl subscribed "[i]n or around the year 2019"). However, the Blackhawks maintain a marketing database, which among other things tracks precisely when and how each individual therein entered the database. Gray Decl., ¶ 6. To the extent an individual signed up for a Blackhawks newsletter through the Blackhawks website, it would be reflected in the database (along with the specific date of sign-up). *Id.* A diligent search of the database revealed that <u>Joiner did not sign up for a newsletter on the Blackhawks website</u>. *Id.*, ¶ 8.

  *The Alleged Disclosures.* Plaintiffs allege that the Team Websites utilize a marketing tool called the Pixel. Compl., ¶¶ 4, 31-32. Plaintiffs claim the Pixel monitors users' web events "which, when triggered, causes the Pixel to automatically send data directly to Facebook." *Id.*, ¶

36.   According to the Complaint, whenever a user loads a webpage on the Team Websites, the Pixel automatically "force[s] Plaintiffs' web browser" to send Facebook the webpage URL and webpage "Microdata tags" that "may include the title of a video" on the webpage. *Id.*, ¶¶ 36-38, 42,47, 48, 66, 139.   Plaintiffs also claim that (i) "[w]hen a Facebook user logs onto Facebook, a 'c_user' cookie—which contains a user's non-encrypted Facebook User ID number ["Facebook ID"]–is automatically created and stored on the user's device for up to a year" (*id.*, ¶ 34), and (ii) "[w]hen a 'c_user' cookie is in place," the user's browser's transmission to Facebook includes a copy of that cookie (*id.*, ¶ 49).[3]   The Complaint does not allege that the NHL (or its Member Teams) was ever in possession of the c_user cookie or the Facebook ID contained therein.

Plaintiffs allege generally that they "viewed video clips using the Team Websites" (*id.* ¶ 138), but they do not provide specific webpages they allegedly visited or identify which videos they allegedly viewed.   Instead, Plaintiffs reference specific webpages without actually alleging that the Plaintiffs visited the specific webpages and accessed a video thereon or that their PII was disclosed by the NHL as a result.   *See generally id.,* ¶¶ 67 – 102.

## LEGAL STANDARD

The NHL moves to dismiss under Rules 12(b)(1) and 12(b)(6).

"[A] Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial or fact-based."   *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017) (quoting *Carter*

---

[3] The Complaint cites Facebook's cookies policy.   *See* Compl. ¶34 n.9 (citing *Cookies & other storage technologies*, FACEBOOK, https://www.facebook.com/policy/cookies/).   The Court can consider Facebook's cookies policy because it is incorporated in and integral to the Complaint.   *See Martin v. Meredith Corp.*, No. 22CV4776 (DLC), --- F. Supp. 3d ---, 2023 WL 2118074, at *3 n.3 (S.D.N.Y. Feb. 17, 2023); *see also Fernandez v. Zoni Language Cntrs., Inc.*, No. 15-cv-6066 (PKC), 2016 WL 2903274, at *3 (S.D.N.Y. May 18, 2016) ("Courts may also take judicial notice of information contained on websites where the authenticity of the site has not been questioned.").   That Policy discloses to Facebook users that Facebook "place[s] cookies on your computer or device [to] receive information stored in cookies when you use or visit . . . [w]ebsites and apps provided by other companies," but explains that a user retains considerable control over the extent to which Facebook uses that information and can utilize browser cookie settings "to choose whether browser cookies are set and to delete them." *Id.*

*v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016)).   A facial attack "challenges the sufficiency of the jurisdictional facts alleged, not the facts themselves." *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 887 n. 15 (2d Cir. 1996).   "However, a defendant may also make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the plaintiffs' pleading." *Katz*, 872 F.3d at 119 (internal mark omitted).   Where, as here, a defendant makes a fact-based challenge, proffering evidence which "reveal[s] the existence of factual problems in the assertion of jurisdiction," plaintiffs "must come forward with evidence of their own to controvert that presented by the defendant." *Carter*, 822 F.3d at 56 (internal mark omitted); *see also Holland v. JPMorgan Chase Bank, N.A.*, No. 19 CIV. 00233 (PAE), 2019 WL 4054834, at *6 (S.D.N.Y. Aug. 28, 2019) ("On a factual challenge, 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'") (quoting *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).   "If the extrinsic evidence presented by the defendant is material and controverted, the district court will need to make findings of fact in aid of its decision as to standing." *Carter*, 822 F.3d at 57.   "[T]he plaintiff has the burden of proving by a preponderance of evidence that subject matter jurisdiction exists." *Katz*, 872 F.3d at 120.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   "[D]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).   A court should generally accept well-pleaded factual allegations as true, but "that principle does not apply to general allegations that are contradicted by more specific allegations in the Complaint." *DPWN Holdings (USA), Inc. v.*

*United Air Lines, Inc.*, 747 F.3d 145, 151-52 (2d Cir. 2014).  Similarly, a court is "not bound to accept as true a legal conclusion couched as a factual allegation, nor [is it] required to accept as true allegations that are wholly conclusory." *Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014).

## ARGUMENT

**I.     Plaintiffs Lack Article III Standing Because They Have Not Suffered a Concrete Harm and Therefore Have Not Established an Injury in Fact.**

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."  U.S. CONST. Art. III, § 2.  One element of this "bedrock requirement" is that plaintiffs "must establish that they have standing to sue."  *Raines v. Byrd*, 521 U.S. 811, 818 (1997).  The "irreducible constitutional minimum" of standing requires that plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

The Supreme Court "has rejected the proposition that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021).  Rather, "[o]nly those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court."  *Id.*; *see also Maddox v. Bank of New York Mellon Tr. Co.*, N.A., 19 F.4th 58, 64 (2d Cir. 2021) ("TransUnion established that in suits for damages plaintiffs cannot establish Article III standing by relying entirely on a statutory violation or risk of future harm: 'No concrete harm; no

standing.'").   Concrete harms are "physical, monetary, or cognizable intangible harm[s] traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2205-2206.  "A theory that 'circumvents a fundamental requirement" of an analogous common-law tort 'does not bear a sufficiently close relationship' to establish standing." *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.,* 48 F.4th 1236, 1244 (11th Cir. 2022) (quoting *TransUnion*, 141. S. Ct. at 2210 n.6); *accord Kola v. Forster & Garbus LLP*, No. 19-CV-10496, 2021 WL 4135153, at *6 (S.D.N.Y. Sept. 10, 2021) ("TransUnion and cases decided since demonstrate that, where a key element of the analogous common-law or historical harm is missing, the plaintiff lacks standing.").

Applying the foregoing standard, the Plaintiffs lack standing.  First, all Plaintiffs allege a mere statutory violation, not a concrete harm as required *TransUnion*.  Second, even if the mere allegation of a statutory violation were sufficient for standing, the allegation upon which Joiner relies to invoke the VPPA—i.e., that he subscribed to a newsletter on the Blackhawks website— is demonstratively false.

### A.   Mere Alleged Violations of the VPPA Without Allegations of Concrete Harm Are Insufficient to Confer Standing.

Plaintiffs cannot establish that they suffered a concrete harm under the *TransUnion* test. Although they assert that they "have been harmed as a result of Defendants' violations of the VPPA" (Compl., ¶ 11), they do <u>not</u> allege any physical, monetary harm, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts.  *See TransUnion,* 141 S. Ct. at 2206.  Plaintiffs' alleged facts do not establish a privacy-related harm under any privacy tort traditionally recognized in American courts.[4]

---

[4] There are four generally recognized privacy torts: (1) public disclosure of private facts, (2) intrusion upon seclusion, (3) appropriation of a person's name or likeness, and (4) false light publicity.  *See* Restatement (Second) of Torts § 652A (1977).

The touchstone of traditional privacy torts is a disclosure or an intrusion that is "highly offensive to a reasonable person." *Sputz v. Alltran Fin., LP*, No. 21-CV-4663 (CS), 2021 WL 5772033, at *3 (S.D.N.Y. Dec. 5, 2021); *Aponte v. Ne. Radiology, P.C.*, No. 21 CV 5883 (VB), 2022 WL 1556043, at *5 (S.D.N.Y. May 16, 2022); *see also* Restatement (Second) of Torts § 652D cmt. b (listing "sexual relations," "family quarrels," and "unpleasant or disgraceful illnesses" as examples of the "private facts" covered by the tort of public disclosure of private facts). Yet, Plaintiffs fail to explain (because they cannot) how any purported disclosure of information about their alleged viewing of video content related to the NHL (or its Member Teams) could be highly offensive to a reasonable person. There is nothing inherently "highly offensive" about a third party learning that one watched "pre-recorded clips of games" and "interviews with players and team staff, sports analysts, and more" (Compl., ¶ 2) to warrant application of a recognized privacy-related tort to the supposed harms that Plaintiffs allege.[5] Because there is no "close historical or common-law analogue" to Plaintiffs' alleged harm, Plaintiffs have failed to allege more than a bare statutory violation and therefore have not established a concrete harm under *TransUnion*.

---

[5] Apart from this overarching deficiency, there are additional reasons why each specific privacy tort does not bear a sufficiently close relationship to the facts here.

Public disclosure is inapt because Plaintiff does not allege that any actual person—let alone the public at large—ever saw or read any of the information allegedly disclosed to Facebook. *See, e.g., Sputz*, 2021 WL 5772033 at *3 (finding plaintiff lacked standing because disclosure of plaintiff's information to defendant's vendor "[does] not remotely rise to the level of 'publicizing' private information to the public at large").

Intrusion upon seclusion is likewise inapposite, as "the intrusion [must] have caused an injury, not a subsequent disclosure of the information gained from the intrusion." *Cavazzini v. MRS Assocs.*, 574 F. Supp. 3d 134, 141 (E.D.N.Y. 2021) (emphasis added). Plaintiffs' theory is the exact opposite of intrusion upon seclusion, since they argue that the disclosure of information caused their injury, not the intrusion. Indeed, Plaintiffs do not and cannot allege that the NHL (or its Member Teams) ever even accessed or possessed the Facebook cookies in question—the Complaint acknowledges that the cookies reside only on users' browsers and are transmitted from a user's browser to Facebook. Compl., ¶¶ 34, 139; *cf. Aponte*, 2022 WL 1556043, at *5 (finding intrusion of seclusion an inapt analogue when "according to plaintiffs, it is not defendants who improperly accessed plaintiffs' data").

And, appropriation of a person's name or likeness and false light publicity are not remotely at issue in this litigation.

Accordingly, all Plaintiffs lack standing under Article III, and the Complaint should be dismissed in its entirety.  *See TransUnion*, at 2197.

**B.     Plaintiff Joiner Lacks Standing for the Additional Reason that, Contrary to His Allegations, He Did Not Subscribe to a Newsletter on the Blackhawks Website.**

Plaintiff Joiner cannot rely on the VPPA to establish standing for an additional reason— the evidence submitted herewith demonstrates that he is not a "consumer" covered by the VPPA.

The VPPA applies only to "consumers," which it defines to mean "renter[s], purchaser[s], or subscriber[s] of goods or services from a video tape service provider."  18 U.S.C.A. § 2710. Plaintiffs allege that they are "consumers" <u>solely</u> "because they subscribed to the Member Teams' newsletters," specifically the Blackhawks newsletter (Plaintiffs Joiner and Kassl) and the Flyers newsletter (Plaintiff Nam).  Compl., ¶ 137.  However, Joiner has never, in fact, subscribed to a Blackhawks newsletter.  Gray Decl., ¶ 8.  For this further reason, Joiner is not a "consumer" under the VPPA and therefore cannot rely on the VPPA to establish the requisite injury in fact for standing.  *See Passariello v. The Atlantic Monthly Group LLC*, 2:22-cv-08993-JLS-AFM, Dkt. No. 34 (C.D. Cal. May 23, 2023) (attached hereto as <u>Exhibit A</u>) (pre-answer, *sua sponte* order referencing record evidence that the plaintiff was not a subscriber to The Atlantic, explaining that "[i]f Passariello is not a subscriber to The Atlantic the Court is doubtful that he has standing to bring this [VPPA] action," and ordering plaintiff to submit, within seven days, "[e]vidence of his subscription matching the dates alleged in the Complaint").[6]

Based on the foregoing, Joiner's claim should be dismissed pursuant to Rule 12(b)(1).  *See, e.g., Sterk v. Best Buy Stores, L.P.*, No. 11 C 1894, 2012 WL 5197901, at *6 (N.D. Ill. Oct. 17, 2012) (granting 12(b)(1) motion to dismiss VPPA claim for lack of standing where defendants

---

[6] Three days after this order was entered, the plaintiff filed a notice of voluntary dismissal.  *See* <u>Exhibit B</u>.

"produced evidence calling Plaintiff's statutory standing into question" and plaintiff did not "submit[] any competent proof that he [had] statutory standing under the VPPA"); *see also Holland*, 2019 WL 4054834, at *8 (granting 12(b)(1) motion to dismiss TCPA claim for lack of standing based upon factual evidence that defendant did not make any calls to the plaintiff).

## II.  Under a Rule 12(b)(6) Standard, Plaintiffs Fail to State a Claim Under the VPPA.

The VPPA states that "[a] video tape service provider who knowingly discloses, to any person, [PII] concerning any consumer of such provider shall be liable to the aggrieved person." 18 U.S.C. § 2710(b)(1).[7]  Here, Plaintiffs fail to plausibly allege any of the following, all of which are essential to stating a claim under the VPPA: (A) that they are "consumers," (B) the NHL is a "video tape service provider," (C) the NHL disclosed their PII, or (D) the NHL disclosed the information "knowingly."  Each of these failures is an independent basis on which to dismiss the Complaint.

### A.  Plaintiffs Do Not Plausibly Allege that They Are "Consumers."

The VPPA defines "consumer" as a "renter, purchaser, or subscriber of goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).  Plaintiffs do not allege they are "renters" or "purchasers" of any goods or services from the NHL.  Plaintiffs allege that "they subscribed to the Member Teams' newsletters" (Compl., ¶ 137), but even accepting that allegation as true (*but see* Section I.A, *supra*), Plaintiffs are not "subscriber[s]" of any good or service covered by the VPPA.

---

[7] Notably, the VPPA is codified as a criminal statute with civil penalties (under Title 18 – "Crimes and Criminal Procedure"), meaning it must be construed strictly with any ambiguity resolved in favor of the defendant.  *See Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004) ("Because we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies."); *Scottrade, Inc. v. BroCo Invs., Inc.*, 774 F. Supp. 2d 573, 584 (S.D.N.Y. 2011) ("[W]hen a statute has both civil and criminal application, this rule of lenity must be applied consistently to both.").

A court in this District recently addressed this precise issue in *Carter v. Scripps Networks, LLC*, No. 22-cv-2031-PKC, 2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023). The plaintiffs in that putative class action, like the Plaintiffs here, argued that they were "subscribers" under the VPPA because they had signed up for one or more newsletters on the defendant's website. Judge Castel convincingly rejected that argument, explaining that "[i]n the statute's full context, a reasonable reader would understand the definition of 'consumer' to apply to <u>a renter, purchaser or subscriber of audio-visual goods or services</u>, and not goods or services writ large" because "consumer" is "cabined by the definition of 'video tape service provider,' with its focus on the rental, sale or delivery of audio visual materials." *Id.* at *6 (emphasis added); *see also id* at *5 (noting the Second Circuit's instruction that, in interpreting a statute, courts should not "construe each phrase literally or in isolation" but should "ascertain how a reasonable reader would understand the statutory text, considered as a whole") (quoting *Fed. Housing Finance Agency v. UBS Americas Inc.*, 712 F.3d 136, 142 (2d Cir. 2013)); 18 U.S.C. § 2710 (b)(1) (defining "video tape service provider" as a person "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials").[8]

After considering the allegations set forth in the *Scripps* plaintiffs' complaint, the court concluded that the complaint did not plausibly allege that the plaintiffs were subscribers of the defendant's video services:

> **[T]he Complaint does not include facts that plausibly allege that [Plaintiffs'] status as newsletter subscribers was a condition to accessing the site's videos, or that it enhanced or in any way affected their viewing experience.  <u>They were subscribers to newsletters, not subscribers to audio visual materials</u>.**

---

[8] The court added that, "[w]hile [it] need not rely on statutory history," the Senate Report on the VPPA further supports this interpretation because it "reflects an intent that a customer's non-video transactions play no part in a defendant's liability under the VPPA." *Scripps*, 2023 WL 3061858, at *6.

*Scripps*, 2023 WL 3061858, at *6 (emphasis added); *see also id.* ("The newsletters may entice or encourage recipients to view hgtv.com videos, but there is no assertion that a newsletter subscription was required to access those videos, functioned as a login, or gave newsletter subscribers extra benefits as viewers.").  Because the complaint did "not plausibly allege that plaintiffs acted as 'subscribers' when they viewed videos on hgtv.com, it [did] not plausibly allege that they were 'consumers' under the VPPA." *Id.* at *7.  The court therefore dismissed the complaint. *Id.*; *see also Austin-Spearman v. AMC Network Entertainment LLC*, 98 F. Supp. 3d 662, 671 (S.D.N.Y. 2015) (expressing skepticism that "a plaintiff can constitute a subscriber under the VPPA if she subscribes only to a portion of the provider's services that are distinct and set apart from its provision of videos").

The allegations here are materially identical to those at issue in *Scripps*.  Plaintiffs do <u>not</u> allege that they subscribed to any audio-visual goods or services from the NHL (or any Member Teams).  Although Plaintiffs allege that they subscribed to Member Team newsletters, they do not allege that a newsletter subscription was required to access the videos at issue (it was not) or that it enhanced or in any way affected their viewing experience or the video content available to them (it did not).  In fact, it is clear from the Complaint that "Plaintiffs were free to watch or not watch [the videos at issue] without any type of obligation, no different than any of the other . . . visitors to the site" (*Scripps*, 2023 WL 3061858, at *6).  *See, e.g.,* Compl., ¶ 18 ("[T]he Blackhawks have a team website . . . which, <u>in addition to offering visitors the option to subscribe to a team newsletter</u>, offers streaming audio-visual media, articles, and merchandise sales.") (emphasis added); ¶ 19 ("[T]he Flyers have a team website . . . which, <u>in addition to offering visitors the option to subscribe to a team newsletter</u>, offers streaming audio-visual media, articles, and

merchandise sales.") (emphasis added).  As in *Scripps*, Plaintiffs' alleged newsletter subscriptions do not make them "consumers" under the VPPA.[9]

Plaintiffs have not plausibly alleged—and cannot plausibly allege—that they are "consumers" under the VPPA, which is an essential element for a VPPA claim.  Therefore, Plaintiffs' Complaint must be dismissed in its entirety.

**B.      Plaintiffs Do Not Plausibly Allege that the NHL Is a "Video Tape Service Provider."**

Further, Plaintiffs fail to state a claim because they have not plausibly alleged that the NHL is a "Video Tape Service Provider."

Congress passed the VPPA in 1988 after a video rental store disclosed Supreme Court nominee Robert Bork's video tape rental history to a Washington newspaper, which then published a profile about Bork based on "the titles of 146 films his family had rented" from the store.  *See* S. Rep. No. 100-599, at 5 (1988), reprinted in 1988 U.S.C.C.A.N. 4342-1, *also available at* 1988 WL 243503; *see also In re Nickelodeon*, 827 F.3d at 284 ("We do not think that, when Congress passed the Act, it intended for the law to cover factual circumstances far removed from those that motivated its passage.").   Consistent with this narrow purpose, the Act applies only to video tape service providers, i.e., persons "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).  Moreover, providing such video content must be "a focus of the defendant's work."  *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017).

---

[9] Furthermore, merely signing up to receive a newsletter does not constitute the type of "ongoing commitment or relationship" required to be considered a "subscription" under the VPPA because recipients can opt out of the newsletter "without consequences whenever [they] like."  *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1257 (11th Cir. 2015); *cf. Austin-Spearman*, 98 F. Supp. 3d at 669 (concluding that plaintiff was not a subscriber under the VPPA where she could "decide to never visit the AMC website ever again," and "that decision will have zero consequences, costs, or further obligations").

The name "National Hockey League" is synonymous with a professional ice hockey league.  Even Plaintiffs describe the NHL as being comprised of independent sports teams and "promot[ing] professional and semiprofessional clubs and events."  Compl., at ¶¶ 16-17.  Plaintiffs do not allege facts rendering it even remotely plausible that a sports league, like the NHL (or any of its Member Teams), should be radically (and improperly) re-characterized as a video store or other retailer focused on the sale or delivery of prerecorded video cassette tapes or similar audio visual materials.  "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation"—i.e., the NHL is a "video tape service provider"—does not make it so without sufficient alleged facts to back it up, and Plaintiffs have not alleged facts to show that providing pre-recorded video content is a focus of the NHL's (or its Member Teams') work.  *See Iqbal*, 556 U.S. 662 at 678.

Based on the foregoing, Plaintiffs have not plausibly alleged that the NHL is a "video tape service provider," which is an essential element for a VPPA claim.  Accordingly, Plaintiffs' Complaint must be dismissed in its entirety.

## C.    Plaintiffs Do Not Plausibly Allege that the NHL Disclosed Their PII.

The VPPA defines PII as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).  Thus, for a viable VPPA claim, the defendant must have disclosed "1) a consumer's identity; 2) the identity of 'specific video materials'; and 3) the fact that the person identified 'requested or obtained' that material."  *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095, 1105 (N.D. Cal. 2015) ("The point of the VPPA, after all, is not so much to ban the disclosure of user or video data; it is to ban the disclosure of information connecting a certain user to certain videos.") (emphasis added).

### 1. Plaintiffs Fail to Plausibly Allege that the NHL Disclosed the Plaintiffs' Identities Because the c_user Cookie Would Not Readily Permit an Ordinary Person to Identify the Plaintiffs.

Courts in this District have endorsed the view that "PII only refers to 'the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior.'" *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 91 (S.D.N.Y. 2022) (quoting *In re Nickelodeon*, 827 F.3d at 267); *see also Bernardino v. Barnes & Noble Booksellers, Inc.*, 17-CV-04570 (LAK) (KHP), 2017 WL 3727230, at *8 (S.D.N.Y. Aug. 11, 2017) (explaining that "Congress sought 'to prevent disclosures of information that would, with little or no extra effort, permit an ordinary recipient to identify a particular person's video-watching habits.'"), report and recommendation adopted 2017 WL 3726050, at *1 (S.D.N.Y. Aug. 28, 2017). "The classic example [of PII under the VPPA] will always be a video clerk leaking an individual customer's video rental history. Every step away from that 1988 paradigm will make it harder for a plaintiff to make out a successful claim." *In re Nickelodeon*, 827 F.3d at 290.

Here, Plaintiffs rely on the alleged transmission of c_user cookies, which contain a string of numbers that make up the visitor's Facebook ID. *See* Compl., ¶ 34; see also ¶ 65 ("Defendants' Team Websites implement the Pixel which track . . . Plaintiffs' and Class Members' PII in the form of the Facebook UID through their c_user cookies."). Plaintiffs suggest that an "ordinary person" would know that an opaque string of numbers from these cookies is actually a Facebook ID and would know to "simply append[]" that string of numbers to the www.facebook.com URL, bringing them to the user's Facebook page. *See id*. at ¶ 35. These arguments strain credulity and fall woefully short of what is required to state a claim under the VPPA. "To an average person, . . . a digital code in a cookie file would likely be of little help in trying to identify an actual person." *In re Nickelodeon*, 827 F.3d at 283.

17

### 2.   Plaintiffs Fail to Plausibly Allege that the NHL Disclosed the Identity of Specific Video Materials That Plaintiffs "Requested or Obtained."

Plaintiffs fail to plausibly allege that the Pixel sent Facebook information about "specific video materials or services" that Plaintiffs "requested or obtained." 18 U.S.C. § 2710(a)(3).

The recent decision in *Martin v. Meredith Corp.*, No. 22CV4776 (DLC), --- F. Supp. 3d ---, 2023 WL 2118074, at *1 (S.D.N.Y.  Feb. 17, 2023), is instructive.  In *Meredith*, the plaintiff alleged that the defendant, the operator of people.com, violated the VPPA by disclosing video URLs and Facebook IDs to Facebook.  As the court explained, however, plaintiffs failed to allege "essential information for a VPPA claim, including at least: (1) whether the webpage contains a video; (2) if so, the name of the specific video materials on the page; (3) whether there are multiple videos on the page and, if so, which 'specific video materials' were requested or obtained by the website visitor; and (4) whether the website visitor 'requested or obtained' any videos at all, or instead merely read an article on the webpage."  *Id.* at *9-10 (emphasis added).  The court dismissed the plaintiff's VPPA claim based on these deficiencies.

Here, the Complaint is similarly deficient because it fails to allege essential elements to support a VPPA claim, including that it fails to: (1) identify a specific webpage that Plaintiffs viewed that contains a video; (2) name any specific videos on the page(s) accessed by the Plaintiffs; (3) identify which specific videos Plaintiffs "requested or obtained"; and/or (4) assert that Plaintiffs "requested or obtained" any specific videos at all (instead of, for example, merely reading an article, reviewing non-video material on the webpage or just opening the page).

To the extent the Complaint references specific web pages, Plaintiffs did <u>not</u> allege to have visited them (and, even if Plaintiffs did visit such web pages, they did not allege to have watched videos thereon).  For example, Figure 6 of Plaintiffs' Complaint, which depicts a video on the Flyers website, clearly includes a written article as well.  *Id*.  In other words, even assuming

Plaintiffs visited this webpage, the information that the Plaintiffs allege the Pixel would have forced Plaintiffs' browsers to send to Facebook (i.e., the webpage URL and Microdata tags, as well as any c_user cookie present on the user's browser, upon the user loading of the webpage) would "not identify a person as having requested or obtained the video on that page <u>since the person may instead have merely reviewed an article on the page or opened the page and done nothing more</u>."  *Meredith*, 2023 WL 2118074, at *1 (emphasis added); *see also id. at* *3 ("Indeed, from the information disclosed to Facebook by People.com, it would not even be clear if the person associated with the Facebook ID is a consumer of video media.").

### 3.  The NHL Never Possessed—Let Alone Disclosed—Plaintiffs' c_user Cookies or Facebook IDs.

While Plaintiffs make the conclusory assertion that the NHL "disclosed" Plaintiffs PII to Facebook, the Complaint's specific allegations make it clear that is not the case.  *See DPWN Holdings (USA), Inc.*, 747 F.3d at 151-52 (noting that a court need not accept as true general allegations in a complaint "that are contradicted by more specific allegations").  Specifically, even assuming that the c_user cookies at issue contain sufficiently identifiable information to constitute PII (which they do not), Plaintiffs' own Complaint establishes that (1) the c_user cookies are <u>Facebook's</u> cookies, not the NHL's (Compl., ¶ 34 & n.9) and (2) it is the <u>user's</u> browser, not the NHL, which sends the cookies back to Facebook (Compl., ¶ 139).  Indeed, Plaintiffs do not even allege that the NHL (or its Member Teams) ever possessed the Plaintiffs' c_user cookies or Facebook IDs (they did not).  It should go without saying that the NHL cannot "disclose" something it never knew or possessed, constituting yet another ground for dismissal.  *See Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017) (concluding that ESPN had not disclosed PII because the information it disclosed could not identify an individual unless "combined with other data in Adobe's possession," data that ESPN "apparently never even

possessed"); *see also Robinson v. Disney Online*, 152 F. Supp. 3d 176, 182 (S.D.N.Y. 2015) (dismissing VPPA claim for failure to plausibly allege disclosure of PII and explaining that "the information actually 'disclose[d]' by a 'video tape service provider,' . . . must itself do the identifying that is relevant for purposes of the VPPA"—"not information disclosed by a provider, plus other pieces of information collected elsewhere by non-defendant third parties").[10]

Because the Complaint does not plausibly allege that the NHL ever disclosed Plaintiffs' Facebook IDs, Plaintiffs have failed to state a VPPA claim and the Complaint must be dismissed in its entirety.

**D.      Plaintiffs Do Not Plausibly Allege that the NHL "Knowingly" Disclosed Their PII.**

Assuming arguendo Plaintiffs had adequately alleged that the NHL disclosed PII, Plaintiffs nonetheless fail to plausibly allege a "knowing" disclosure as required by the VPPA.  To plead a knowing disclosure, a plaintiff must allege facts showing "that the video-service provider <u>actually knew</u> that it was disclosing: 1) a user's identity; 2) the identity of the video materials; <u>and</u> 3) the connection between the two—i.e., that the given user had 'requested or obtained' the given video material."  *In re Hulu Priv. Litig.*, 86 F. Supp. 3d at 1097; *see also id.* at 1095 ("[K]nowingly' means consciousness of transmitting the private information. It does not merely mean transmitting the code"); *Bernardino*, 2017 WL 3727230, at *9 ("If Barnes & Noble did not think it was conveying PII, then there could be no knowledge of the conveyance, regardless of whether it knew what Facebook might do with the information.").  A plaintiff cannot rely on legal labels or sprinkle in the word "knowingly" here and there; rather, he must specifically "allege facts giving rise to a

---

[10]      Plaintiffs attempt to circumvent this fatal flaw by alleging that the Pixel "forces" their web browsers to send information to Facebook, but this specious pleading does not change the fact that the only disclosure alleged is one between the user and Facebook. The VPPA does not prohibit "causing" a disclosure.  Had Congress intended the VPPA to prohibit causing a disclosure, it would have said so. *Compare, e.g.,* 15 U.S.C. § 6821 (prohibiting any person to "<u>cause to be disclosed</u> . . . customer information of a financial institution" (emphasis added)); 10 U.S.C. § 949p-5 ("accused reasonably expects to disclose, <u>or to cause the disclosure of,</u> classified information" (emphasis added)).

reasonable inference that [the defendant] knowingly or willfully disclosed PII to someone other than the consumer."  *Mollett v. Netflix, Inc.*, No. 5:11-CV-01629-EJD, 2012 WL 3731542, at *4 (N.D. Cal. Aug. 17, 2012), *aff'd*, 795 F.3d 1062 (9th Cir. 2015); *see also Iqbal*, 566 U.S. at 678 ("A pleading that offers 'labels or conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'").  Plaintiffs have failed to do just that.

First, Plaintiffs fail to plead that the NHL had actual knowledge that it was disclosing users' identities, as the Complaint does not allege the NHL knew its website users with Facebook accounts would allow Facebook to incorporate the "c_user" cookie into their browsers that could identify them.  Next, Plaintiffs fail to plead that the NHL had actual knowledge that it was disclosing the identity of any specific video materials, as there are no allegations that the NHL knew that Facebook would review webpage URLs to determine the name of any videos on that page.  Finally, Plaintiffs fail to plead that the NHL had actual knowledge that it was disclosing the connection between a specific user and a specific video because there is no allegation that the NHL knew Facebook would use the c_user cookie and the webpage URL to infer that a particular user watched a particular video on a webpage.

Because Plaintiffs' do not plausibly allege that the NHL "knowingly" disclosed their PII, Plaintiffs have failed to allege an essential basis for a VPPA claim, and the Complaint must be dismissed in its entirety.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants NHL Enterprises, Inc. and National Hockey League respectfully request that the Court enter an Order granting their motion, dismissing the Complaint in its entirety with prejudice, and awarding such other relief as the Court deems just and proper.

Dated:        New York, New York
              June 20, 2023

                              Respectfully submitted,

                              **HOLLAND & KNIGHT LLP**


                              _____

                              Mark S. Melodia
                              Stosh M. Silivos
                              Sophie L. Kletzien
                              31 West 52nd Street
                              New York, New York 10019
                              (212) 513-3200
                              mark.melodia@hklaw.com
                              stosh.silivos@hklaw.com
                              sophie.kletzien@hklaw.com

                              *Attorneys for Defendants NHL Enterprises, Inc. and*
                              *National Hockey League*

# EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:22-cv-08993-JLS-AFM                           Date: May 23, 2023
Title: Salomon Passariello v. The Atlantic Monthly Group LLC

Present: **Honorable JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE**

| V.R. Vallery | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

ATTORNEYS PRESENT FOR PLAINTIFF:     ATTORNEYS PRESENT FOR DEFENDANT:

Not Present                                         Not Present

**PROCEEDINGS: (IN CHAMBERS) ORDER TO SHOW CAUSE RE SUBJECT MATTER JURISDICTION**

Plaintiff Salomon Passariello filed this putative class action on December 12, 2022, bringing claims for violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, *et seq.*, as well as claims for violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, and for unjust enrichment, flowing from the VPPA violation. (Compl., Doc. 1 ¶¶ 62-87.) Passariello alleges that Defendant The Atlantic Group Monthly LLC shared his personally identifiable information ("PII") with another company, Meta, in violation of the VPPA. (*Id.* ¶ 20.) He alleges that he "has been a paying member of The Atlantic since approximately 2020 and is therefore a 'subscriber' to The Atlantic under the VPPA" and that he "provided The Atlantic with his PII, including at least his name and email address, when subscribing to its services." (*Id.* ¶¶ 15, 17.)

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). District courts have a duty to establish subject matter jurisdiction, regardless of whether the parties raise the issue. *See United Invs. Life Ins. Co. v. Waddell & Reed, Inc.*, 360 F.3d 960, 966-67 (9th Cir. 2004). "In the absence of standing, a federal court lacks subject matter jurisdiction over the suit." *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1172 (9th Cir. 2013) (quotations omitted). As such, district courts have "both the power and the duty to raise the adequacy of [a plaintiff]'s standing sua sponte." *Bernhardt v. Cnty. of L.A.*, 279 F.3d 862, 868 (9th Cir. 2002). To have Article III standing, a plaintiff must "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:22-cv-08993-JLS-AFM                                    Date: May 23, 2023
Title: Salomon Passariello v. The Atlantic Monthly Group LLC

(2016). To establish an injury in fact, a plaintiff must show that she suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

In connection with its Motion to Transfer (Doc. 23), The Atlantic submitted a declaration by its Chief Growth Officer Meghavaty Garibaldi stating that "The Atlantic has no record of anyone with the name 'Salomon Passariello' as having any account or subscription with The Atlantic." (Garibaldi Decl., Doc. 23-3 ¶ 4); *see also Mastren v. Long Beach, Cal. Area Loc. Am. Postal Workers Union, AFL CIO*, No. 05-06877, 2005 WL 8156569, at *3 (C.D. Cal. Dec. 22, 2005) ("The court may consider evidence outside the pleadings in determining its subject-matter jurisdiction *sua sponte*" (quotations omitted)). The Atlantic also represented that "Plaintiff has [] for several months prevented The Atlantic from verifying the existence of Plaintiff's subscription by refusing to provide his email address registered with the alleged subscription." (Doc. 30 at 7 n.2.) The Atlantic then updated its Reply in support of its Motion to Transfer to state that Passariello had supplied his email address. (Doc. 33 at 4-5.) The Atlantic submitted a further declaration by Garibaldi stating that the email address Passariello provided "was used to sign up for a free email newsletter from The Atlantic on November 29, 2022," two weeks before this action was filed, and that "The Atlantic has no record of Plaintiff's Email Address being provided to The Atlantic in connection with any account registration, newsletter signup, print or digital subscription to The Atlantic, or otherwise, prior to that date." (Garibaldi Decl., Doc. 33-1 ¶ 5.) Further, according to Garibaldi, "[o]n May 11, 2023, Plaintiff's Email Address was used to create a free account on www.theatlantic.com," months after this action was filed. (*Id.* ¶ 8.)

Finally, The Atlantic draws the Court's attention to another putative VPPA class action Passariello brought in this District. *See Salomon Passariello v. Forbes Media LLC et al*, No. 2:22-cv-08908-PA-KS (C.D. Cal.). There, the Chief Data Officer for the defendant, Forbes, attested that Passariello had provided in the litigation two email addresses ostensibly associated with his subscription; one was not associated with any account, and the other was associated with a digital subscription purchased thirty minutes after Passariello's counsel provided Forbes the email address – months after the complaint in the action was filed. (*Id.* Doc. 18-1 ¶¶ 2-5.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:22-cv-08993-JLS-AFM                                Date: May 23, 2023
Title: Salomon Passariello v. The Atlantic Monthly Group LLC

If Passariello is not a subscriber to The Atlantic, the Court is doubtful that he has standing[1] to bring this action, and, therefore, that the Court has subject matter jurisdiction over the case. In light of the evidence provided by the Atlantic that Passariello is not a subscriber, Passariello is ORDERED to show cause, in writing, **within seven days of the date of this Order**, why he has standing to bring this action. Evidence of his subscription matching the dates alleged in the Complaint should be submitted therewith. The Atlantic may submit a response within **five days** thereafter. Failure by Passariello to timely respond may result in sanctions, up to and including dismissal of the action.

Initials of Preparer:  vrv

---

[1] While at least one court has found that allegations of invasion of privacy linked to a subscription to a free newsletter are sufficient for Article III standing, *see Carter v. Scripps Networks, LLC*, No. 22-2031, 2023 WL 3061858, at *2 (S.D.N.Y. Apr. 24, 2023), the injury alleged in Passariello's complaint is unrelated to a newsletter; he rather alleges that as a "paid subscriber" he "visited The Atlantic's website to request and watch prerecorded video content" that was subsequently shared with Meta along with his personal information, and that "Plaintiff and Class members paid for access to The Atlantic's website, in part, because they trusted that The Atlantic's privacy practices comported with their privacy preferences." (Compl. ¶¶ 15, 19-20, 48.) Passariello relies heavily on his status as a paying subscriber to form the basis of his allegations that confer standing. *Cf. Carter*, 2023 WL 3061858, at *1-2 (noting that plaintiffs alleged that they were consumers under the VPPA because they subscribed to the defendant's free newsletter, and that they alleged that "[t]he principal purpose of the newsletter is to drive traffic to [defendant]'s website").

# EXHIBIT B

Adam E. Polk (SBN 273000)
Simon S. Grille (SBN 294914)
Kimberly Macey (SBN 342019)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
*apolk@girardsharp.com*
*sgrille@girardsharp.com*
*kmacey@girardsharp.com*

Sean Greene (SBN 328718)
**GIRARD SHARP LLP**
222 Pacific Coast Highway, Floor 10
El Segundo, CA 90245
Tel: (415) 544-6453
*sgreene@girardsharp.com*

[Additional counsel on signature page]

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| SALOMON PASSARIELLO, individually and on behalf of all others similarly situated, | CASE NO. 2:22-CV-08993-JLS-AFM |
| Plaintiff, | **NOTICE OF VOLUNTARY DISMISSAL PURSUANT TO F.R.C.P. 41 (a)(1)(A)(i)** |
| v. | |
| THE ATLANTIC MONTHLY GROUP LLC, | |
| Defendant. | |

PLEASE TAKE NOTICE that, pursuant to Rule 41 (a)(1)(A)(i) of the Federal Rules of Civil Procedure, Plaintiff Salomon Passariello hereby dismisses all causes of action in the complaint as to Defendant The Atlantic Monthly Group LLC ("The Atlantic") without prejudice. The Atlantic has filed neither an answer to the complaint nor a motion for summary judgment as to these claims, and no discovery has been undertaken as to these claims.

Respectfully submitted,

Dated: May 26, 2023            By: /s/ *Kimberly Macey*
                               Adam E. Polk (SBN 273000)
                               Simon S. Grille (SBN 294914)
                               Kimberly Macey (SBN 342019)
                               **GIRARD SHARP LLP**
                               601 California Street, Suite 1400
                               San Francisco, CA 94108
                               Tel: (415) 981-4800
                               *apolk@girardsharp.com*
                               *sgrille@girardsharp.com*
                               *kmacey@girardsharp.com*

                               Sean Greene (SBN 328718)
                               **GIRARD SHARP LLP**
                               222 Pacific Coast Highway, Floor 10
                               El Segundo, CA 90245
                               Tel: (415) 544-6453
                               *sgreene@girardsharp.com*

                               Christopher J. Cormier (*Pro Hac Vice*)
                               **BURNS CHAREST LLP**
                               4725 Wisconsin Ave., NW, Suite 200
                               Washington, D.C. 20016
                               Telephone: (202) 577-3977
                               *ccormier@burnscharest.com*

1

NOTICE OF VOLUNTARY DISMISSAL PURSUANT TO F.R.C.P. 41 (a)(1)(A)(i)
CASE 2:22-CV-08993-JLS-AFM

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Hannah M. Crowe (*Pro Hac Vice*)
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
*hcrowe@burnscharest.com*

*Attorneys for Plaintiff*

NOTICE OF VOLUNTARY DISMISSAL PURSUANT TO F.R.C.P. 41 (a)(1)(A)(i)
CASE 2:22-CV-08993-JLS-AFM