```
┌─────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #:                          │
│ DATE FILED:  8/29/2025          │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ZACHARY JOINER, et al.,

    Plaintiff,

        -against-

NHL ENTERPRISES, INC., et al.,

    Defendants.

23-CV-2083 (LAK) (BCM)

**REPORT AND RECOMMENDATION
TO THE HON. LEWIS A. KAPLAN**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiffs Zachary Joiner, Daniel Kassl, Hanwook Nam, and Jim Donato filed this action individually and on behalf of all others similarly situated against defendants NHL Enterprises, Inc. (NHL Enterprises) and the National Hockey League (the League) (collectively the NHL), asserting federal claims under the Video Privacy Protection Act (VPPA), 18 U.S.C. § 2710, and the Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510, *et seq.*, as well as two state law causes of action: "intrusion upon seclusion" and (on behalf of plaintiff Nam and a putative Pennsylvania subclass) violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act (WESCA), 18 Pa. C.S. § 5701, *et seq*.

Plaintiffs' claims are all premised on defendants' placement and usage of a product called the "Pixel" on their websites. The Pixel, which was created by Meta Platforms, Inc. (Meta or Facebook), is a piece of code that can be integrated into a website. Once activated, it tracks the actions taken by website visitors and sends a record of those actions to Facebook for marketing purposes. Now before me for report and recommendation (*see* Dkt. 8) is defendants' motion to dismiss all of plaintiffs' claims, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. 44.) For the reasons that follow, I recommend, respectfully, that the motion be granted in full and that leave to further amend be denied.

## I.    BACKGROUND

### A.    Facts

#### 1.    The NHL and Its Websites

Defendant NHL Enterprises is a Delaware limited liability company headquartered in New York, New York. Am. Compl. (Dkt. 43) ¶ 26. NHL Enterprises "operates and promotes professional and semiprofessional clubs and events, including through the development of websites and mobile apps." *Id.* Defendant League is "a private corporation headquartered in New York, New York," *id.* ¶ 27, which is "considered a private trade organization, made up of 32 independent corporations," *id.* – that is, 32 professional hockey teams. *Id.*

The NHL operates a website at www.nhl.com (the NHL Website), and each NHL team has its own website (a Team Website; collectively, the Websites), accessible through the NHL Website,[1] utilizing "content derived and hosted by the NHL." Am. Compl. ¶ 27. All of the Team Websites offer prerecorded "audiovisual content" (videos), including interviews, game clips, and analysis. *Id.* ¶¶ 3, 27. Additionally, they allow visitors to sign up for notifications or team newsletters by providing personal information including their names, email addresses, and zip codes, thereby becoming "Subscribers." *Id.* ¶¶ 2, 27. Plaintiffs are themselves Subscribers, *see id.* ¶¶ 22-25, and seek to bring this action on behalf of all other Subscribers who "watched videos on the Team Websites after exchanging personal information for [their] subscriptions[.]" *Id.* ¶ 1.

Although "[e]ach Team Website can be navigated to as though it were an individual site," the NHL "originates and hosts" the content and coding for all of the Team Websites. Am. Compl. ¶¶ 28-29, 83. That is, all of the videos are "produced by the NHL" and "hosted on the NHL

---

[1] For example, the Chicago Blackhawks maintain a website at www.nhl.com/blackhawks. *See* Am. Compl. ¶ 1 n.1 (listing all 32 Team Websites).

domain." *Id.* ¶ 83. Thus, "when the Team Websites are visited by a user, the Team Websites request the assets from the NHL, which are subsequently loaded to users' computers." *Id.* ¶ 88. The NHL earns revenue from these videos "via ads that Subscribers must watch before and during requested videos." *Id.* ¶ 4.

### 2. The Facebook Pixel

The gravamen of plaintiffs' case is that by placing the Facebook Pixel on the Team Websites, the NHL captures personally identifying information (PII) from Subscribers, tracks their activity, and shares this information with Facebook, all without the Subscribers' consent. *See* Am. Compl. ¶¶ 5, 10-12. Plaintiffs further allege that the NHL does this "purposefully," knowing that the Subscribers' PII and video watching activity will be shared with Facebook. *Id.* ¶¶ 10, 110-16.

Facebook is the largest social media network on the planet, with 2.9 billion monthly active users. Am. Compl. ¶ 90. Facebook "monetizes users by selling advertisers access to their Facebook feeds." *Id.* ¶ 91. Facebook specifically targets users with advertising on its platform by filtering audiences "through interests, demographics, web activity history, etc." *Id.* ¶ 92. Plaintiffs allege that Facebook "can target users so effectively because it monitors and analyzes user activity both on and off its site," due in part to products like the Pixel, which allow Facebook to "infer details about users beyond what users explicitly disclose[.]" *Id.*

For example, plaintiffs explain, an advertiser on Facebook can use the "Custom Audiences" feature, Am. Compl. ¶ 93, which enables the advertiser to look beyond its existing customers "to find new people who share similar qualities.'" *Id.* To find those "new people who share similar qualities," the advertiser is required to supply Facebook with data concerning its own users, either by manually uploading customer contact information from its own databases or by using a

"Business Tool" from Facebook, such as the Pixel, which transmits the required information automatically. *Id.* ¶¶ 93, 95.

The Pixel is a piece of code that – once integrated into a website and activated – tracks the actions taken by website visitors and sends a record of those actions to Facebook. Am. Compl. ¶ 96. Specifically, when a visitor clicks on a video within a Team Website, the Pixel automatically "compels [the] visitor's browser" to disclose data concerning the visitor's actions ("Event Data") to Facebook. *Id.* ¶¶ 93, 129. The Event Data includes a "PageView event" and a "Microdata event," both of which disclose "the title or description of videos [the] user has requested." *Id.* ¶¶ 121-22, 127-28.

The PageView event looks like this:



*Id.* ¶ 121 (red box provided by plaintiffs). The Microdata event looks like this:



*Id.* ¶ 122 (red boxes provided by plaintiffs).

4

If the visitor is signed in to Facebook (on the same device) while watching NHL videos, the Pixel also captures that visitor's "c_user cookie," that is, his or her unencrypted Facebook ID (FID), as follows:



Am. Compl. ¶ 129 (red box provided by plaintiffs). Plaintiffs also include an unredacted sample FID:



*Id.* ¶ 131. According to plaintiffs, this information, in combination, "permits an ordinary person to identify the Subscriber," and match him with his video choices, whenever that Subscriber "watches pre-recorded video on the Website while logged into Facebook[.]" *Id.* ¶ 129.

Prior to using the Pixel, an advertiser must create a "business manager" account, and agree to the "Business Tools Terms" which informs it how the Pixel operates. Am. Compl. ¶¶ 98-99, 110. Advertisers are told that "using the Pixel will result in Facebook receiving users' information 'that personally identifies [them] . . . ' ('Contact Information') and information 'about [users] and the actions they take on your websites . . .' ('Event Data')." *Id.* ¶ 100 (alterations in original); *see also id.* ¶ 103 ("Meta explicitly explains that the Pixel combines users' identifying information with their activity on websites to build marketing profiles"). However, plaintiffs allege,

Subscribers to the Team Websites are not asked for their informed, written consent to share their identities and website activity with Facebook or other third parties. *Id.* ¶¶ 141-42.[2]

### 3.    Plaintiffs' Use of NHL Websites

Plaintiff Zachary Joiner resides in Illinois, and has subscribed to online newsletters provided by the NHL and the Chicago Blackhawks since approximately 2021. Am. Compl. ¶ 22. To subscribe to the newsletters, Joiner provided his personal information, including his name, email address, and zip code. *Id.* After subscribing, Joiner watched content on the Blackhawks Website while using a device that was signed in to Facebook, including as recently as "a few weeks prior to the filing of Plaintiffs' first Complaint on March 10, 2023." *Id.*

Plaintiff Daniel Kassl resides in Illinois, and has subscribed to the Blackhawks' online newsletter since approximately 2019. Am. Compl. ¶ 23. He too provided his personal information, including his name, email address, and zip code. *Id.* After subscribing, Kassl watched content on the Blackhawks Website using a device that was signed in to Facebook, including as recently as February 2023. *Id.*

Plaintiff Hanwook Nam resides in Pennsylvania, and has subscribed to the online newsletters provided by the NHL and the Philadelphia Flyers since approximately 2022. Am. Compl. ¶ 24. After providing his personal information, Nam watched content on the Flyers Website while using a device that was signed in to Facebook, "including specifically during the pre-season of the NHL's 2022-23 season." *Id.*

---

[2] Plaintiffs acknowledge that Subscribers must agree that they have read the NHL Privacy Policy prior to subscribing, but argue that to the extent the Privacy Policy contains "information about any of the Team Websites' data sharing," that information is "not presented to Subscribers of the site in a transparent manner." Am. Compl. ¶ 143.

Plaintiff Jim Donato resides in Nevada, and is a subscriber to the NHL and Blackhawks newsletters. Am. Compl. ¶ 25. After providing his personal information, he watched content on the Blackhawks Website using a device that was signed in to Facebook, specifically between November 2022 and March 2023. *Id.* In addition to watching Blackhawks content, Donato watched content about the Vegas Golden Knights (another NHL team). *Id.*

### B.    Procedural History

Plaintiffs filed this action on March 10, 2023, asserting a single cause of action under the VPPA. *See* Compl. (Dkt. 5) ¶¶ 128-145. On March 15, 2023, the case was referred to me for general pretrial management and report and recommendation on dispositive motions. (Dkt. 8.) On June 20, 2023, defendants moved to dismiss the initial complaint pursuant to Fed. R. Civ. P 12(b)(1) (lack of standing) and 12(b)(6) (failure to state a claim). (Dkt. 23.)

On November 1, 2023 – after the motion to dismiss was fully briefed – plaintiffs moved to stay the case (Dkt. 33), arguing that the parties would benefit by waiting for the decision of the Second Circuit Court of Appeals in *Salazar v. National Basketball Association*, No. 23-1147 (2d Cir.), in which the plaintiff alleged that the National Basketball Association (NBA) violated the VPPA by disclosing his NBA video-watching history and FID without his permission. I granted the stay on February 15, 2024. (Dkt. 36.) On October 15, 2024, the Second Circuit held – as relevant here – that Salazar had standing to sue, *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 540-45 (2d Cir. 2024), and that by providing his personal information to the NBA in exchange for subscribing to its online newsletter, he became a "subscriber of goods and services from a video tape service provider," and therefore a "consumer," as that term is used in the VPPA. *Id.* at 540, 545-53. However, the *Salazar* court left a number of related questions unanswered, such as

whether, by installing the Facebook Pixel, the NBA knowingly disclosed "personally identifiable information," as that term is used in the VPPA. *Id*. at 549.

On October 22, 2024, the parties jointly requested the opportunity to "refresh" their pleadings and motion papers in light of *Salazar* (and other VPPA decisions issued since they briefed defendants' initial motion to dismiss). (Dkt. 40.) I granted that request on October 23, 2024. (Dkt. 41.)

Plaintiffs filed their Amended Complaint on November 13, 2024, invoking this Court's diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). Am. Compl. ¶ 30. Plaintiffs asserted two federal causes of action – under the VPPA and the Wiretap Act – and two state law claims, for intrusion upon seclusion and violation of WESCA. On December 12, 2024, defendants filed the instant motion to dismiss, accompanied by a memorandum of law (Def. Mem.) (Dkt. 46) and the declaration of attorney Sophie L. Kletzien (Kletzien Decl.) (Dkt. 45), attaching Facebook's signup page, Terms of Service, Privacy Policy page, and Cookies Policy, in each case as they existed on March 10, 2023. Kletzien Decl. Exs. A-D.

As to the VPPA, defendants argue that plaintiffs have failed to plausibly allege (i) that the NHL is a "video tape service provider" (VTSP), as that term is used in the statute; (ii) that the NHL disclosed plaintiffs' PII (which for purposes of the VPPA means "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider," 18 U.S.C. § 2710(a)(3)); or (iii) that the NHL "knowingly" did so. Def. Mem. at 7-14. As to the Wiretap Act, defendants argue that they cannot be liable because the NHL was a party to the challenged communications, and that the "crime-tort exception" does not apply. *Id*. at 14-18. As to plaintiffs' state law claims, defendants argue that they both fail under New York law, which does not recognize a private right of action for "intrusion upon seclusion" or

wiretapping. *Id*. at 18-20. In the alternative, defendants contend that plaintiffs cannot state a claim under either of their state law theories, in part because, as Facebook users, they consented to the "tracking" at issue. *Id*. at 20-25.

Plaintiffs filed their opposition memorandum (Pl. Opp.) (Dkt. 47) on January 13, 2025, contesting each point raised by defendants. Defendants filed their reply brief (Def. Reply) (Dkt. 49) on January 29, 2025. Since then, both sides have filed notices of supplemental authority to apprise the Court of relevant legal developments (*see* Dkts. 50-51, 57, 60-61), including the Second Circuit's recent decision in *Solomon v. Flipps Media, Inc.*, 136 F.4th 41 (2d Cir. 2025). As relevant here, *Solomon* held that "liability under the VPPA should be limited to the disclosure of information that would permit an ordinary person to learn a specific individual's video-watching history," *id*. at 53, and that the disclosure of plaintiff's FID and video-streaming history, as a result of defendant's use of the Facebook Pixel, did not meet this standard. *Id*. at 54-55; *see also Hughes v. Nat'l Football League*, 2025 WL 1720295, at *1-2 (2d Cir. June 20, 2025) (summary order) (affirming denial of VPPA claim against the NFL "in light of our decision in *Solomon*," which "effectively shut the door for Pixel-based VPPA claims").

## II.    LEGAL STANDARDS

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

When faced with a Rule 12(b)(6) motion, the trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, those factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[A] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (internal citations omitted) (quoting *Twombly*, 550 U.S. at 555, 557); *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("[W]e are not bound to accept as true a legal conclusion couched as a factual allegation.") Thus, the courts will not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

Because the purpose of a Rule 12(b)(6) motion is "to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits," *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006), the court ordinarily may not accept "matters outside the pleadings" without converting the motion into one for summary judgment. Fed. R. Civ. P. 12(d). However, the Second Circuit has authorized the district courts to consider documents attached to the complaint or incorporated in it by reference, *Chambers v. Time Warner*, *Inc.*, 282 F.3d 147, 152 (2d Cir. 2002), and "documents that, although not incorporated by reference, are 'integral' to the complaint." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)). "Of course, [the court] may also consider matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner Inc.*, 937

10

F.2d 767, 773 (2d Cir. 1991). In this case, as discussed below, the Court can – and should – resolve the pending motions without considering the extrinsic materials submitted by defendants.

## III.    ANALYSIS

### A.    Plaintiffs Fail to State a Claim Under the VPPA

The VPPA, enacted in 1988, created "a private right of action for plaintiffs to sue persons who disclose information about their video-watching habits." *Martin v. Meredith Corp.*, 657 F.Supp.3d 277, 284 (S.D.N.Y. 2023) (quoting *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 278 (3d Cir. 2016)). The statute provides, in relevant part, that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person" for actual, liquidated, and/or punitive damages. 18 U.S.C. §§ 2710(b)(1), 2710(c)(1)-(2). To state a VPPA claim, "a plaintiff must allege that (1) a defendant is a 'video tape service provider,' (2) the defendant disclosed 'personally identifiable information concerning any consumer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by another part of the statute." *Martin*, 657 F. Supp.3d at 284 (quoting *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015)). In *Solomon*, our Circuit agreed that "the statute views disclosure from the perspective of the disclosing party. It looks to what information a video service provider discloses, not to what the recipient of that information decides to do with it." *Solomon*, 136 F.4th at 52 (quoting *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017)).

Here, plaintiffs have plausibly alleged the first element of their VPPA claim. A video tape service provider (VTSP) is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Defendants argue that they are not VTSPs because audiovisual content is not the "focus" of their work. Def. Mem. at 7 (citing *Tawam v. Feld Ent.*

*Inc.*, 684 F. Supp. 3d 1056, 1060 (S.D. Cal. 2023)). However, the applicable standard is not so narrow. *See Salazar*, 118 F.4th at 548 ("The definition of 'video tape service provider' is broad . . . . [T]he statute applies equally to a business dealing primarily in audiovisual materials (think Blockbuster) and one dealing in primarily *non*-audiovisual materials (think a general store that rents out a few movies."). Thus, the "delivery of audiovisual materials on [the defendant's] website, even if only a 'peripheral' feature of the site, subjects it to the VPPA." *Berryman v. Reading Int'l, Inc.*, 763 F. Supp. 3d 596, 603 (S.D.N.Y. 2025); *see also Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 156 (S.D.N.Y. 2023) ("[W]ebsites that provide video content . . . are video tape service providers under the VPPA.") (quoting *Sellers v. Bleacher Rep., Inc.*, 2023 WL 4850180, at *6 (N.D. Cal. July 28, 2023)). In this case, the audiovisual materials accessed by plaintiffs are at least "a peripheral feature of the website[s]" operated by defendants, making them VTSPs as defined by the VPPA.

However, plaintiffs have failed to plausibly allege that the NHL revealed their personally identifiable information, as that term is used in the VPPA. "Congress intended the VPPA to cover not just information that, by itself, identifies a consumer's video-viewing history, but also information *capable* of being used to do so." *Solomon*, 136 F. 4th at 51. In determining whether information is capable of being used to identify a consumer's video-viewing history, courts in the Second Circuit use the "ordinary person standard," under which "'personally identifiable information' encompasses information that would allow an ordinary person to identify a consumer's video-watching habits, but not information that only a sophisticated technology company could use to do so." *Solomon*, 136 F.4th at 51-52; a*ccord Hughes*, 2025 WL 1720295, at *3 (under Solomon, the courts "focus[] on whether an ordinary person would be able to understand

the actual underlying code communication itself, regardless of how the code is later manipulated or used by Facebook").

Applying the "ordinary person" standard to facts functionally indistinguishable from those alleged here,[3] the *Solomon* court held that the use of the Facebook Pixel to capture a subscriber's video viewing history and FID did not violate the VPPA, because the information thereby disclosed was not PII as that term is used in the statute. 136 F.4th at 54-55. Judge Chin, writing for the unanimous panel, explained that although the Pixel captured the title of the video watched by the consumer, "[t]he words of the title" were "interspersed with many characters, numbers, and letters," such that "[i]t is implausible that an ordinary person would . . . understand it to be a video title." *Solomon*, 136 F.4th at 54. Similarly, although the Pixel transmitted the consumer's FID ("embedded in many other lines of code"), the court found it "not plausible that an ordinary person . . . would see the 'c_user' phrase on FITE's servers and conclude that the phrase was a person's FID." *Id*. Additionally, the court noted, plaintiff did not explain "how an ordinary person might access the information on the Pixel's PageView." *Id*. Thus, "Solomon failed to plausibly allege that FITE disclosed 'personally identifiable information' in violation of the VPPA." *Id*. at 55.

_____

[3] The plaintiff in *Solomon* was a "subscriber to a digital video streaming service," operated by defendant FITE, which "sent certain information to Facebook . . . each time she streamed a video," including "(1) a sequence of characters, letters, and numbers that, if correctly interpreted, would identify the title and URL . . . of the video, and (2) her 'Facebook ID' ('FID'), a unique sequence of numbers linked to her Facebook profile." 136 F. 4th at 43. This information was captured by the Facebook Pixel, which FITE had configured, using PageView, so as to "allow[] the Pixel to capture the URL and title of each video that a user accesses on a provider's website, along with that user's FID, which identifies the individual more precisely than a name or email address." *Id*. at 45. Facebook used the information provided through its Pixel "to build detailed profiles about FITE's consumers, which enables FITE to present those same consumers with targeted advertisements. FITE does not disclose or discuss the Pixel specifically in its Terms of Use, Privacy Policy, or any other material provided to subscribers, nor does FITE provide an opportunity for its consumers to decline or withdraw consent to FITE's use of the Pixel." *Id*. at 46.

As the Second Circuit explained in *Hughes*, 2025 WL 1720295, at *2, "*Solomon* effectively shut the door for Pixel-based VPPA claims." Thus, in *Hughes*, the Court of Appeals affirmed the dismissal of another Pixel-based VPPA claim (this one by subscribers to the NFL's websites), again concluding that it was "not plausible that an ordinary person, without [ ] annotation . . . , would see the "c_user" phrase on [this communication] and conclude that the phrase was a person's FID." *Id.* at *3 (alterations and omission in original); *see also Nixon v. Pond5, Inc.*, 2025 WL 2030303 (S.D.N.Y. July 21, 2025) (dismissing VPPA claim against "stock-video seller" that used the Pixel to track its customers' video viewing activities and denying leave to amend "in light of *Hughes*").

Here, as in *Solomon* and *Hughes*, plaintiffs allege that the Pixel captures the name (or a description) of each video that a Subscriber watches, as well as the Subscriber's FID (if the Subscriber is signed in to Facebook on the same device). However, the name of the video, as shown in ¶¶ 121-22 of the Amended Complaint, is "interspersed with many characters, numbers, and letters," such that "[i]t is implausible that an ordinary person would . . . understand it to be a video title." *Solomon*, 136 F.4th at 54. Likewise, absent the red-box annotation provided by plaintiffs in ¶¶ 129 and 131 of the Amended Complaint, "it is not plausible that an ordinary person . . . would see the 'c_user' phrase on [the NFL's] servers and conclude that the phrase was a person's FID." *Solomon*, 136 F.4th at 54; *see also Hughes*, 2025 WL 1720295, at *3 (same); *Nixon*, 2025 WL 2030303, at *5 ("the Second Circuit has now twice rejected" the theory that disclosure of the plaintiff's FID through the "c_user" phrase would permit an ordinary person to identify the plaintiff).[4] I therefore conclude that plaintiffs here, like the plaintiffs in *Solomon*, *Hughes*, and

---

[4] In an effort to support their conclusory allegation that an "ordinary person" could identify the Subscribers on the NFL Website, plaintiffs explain that the FID "can be used by anyone to easily identify a Facebook user by simply appending the FID to www.facebook.com," which will

*Nixon*, have not plausibly alleged that the NHL disclosed their personally identifying information, as that phrase is used in the VPPA, and therefore have not stated a viable claim under the VPPA.

I further conclude that plaintiffs' request for leave to further amend their complaint, *see* Pl. Opp. at 26, should be denied as to their VPPA claim. Plaintiffs point out, correctly, that this Circuit "generally favors amendments," *id.* at 27, but do not even suggest that they could plead additional facts that would re-open the door that *Solomon* "effectively shut." *Hughes*, 2025 WL 1720295, at *2. Thus, as in *Nixon*, "leave to amend would be futile." 2025 WL 2030303, at *6.

### B.    Plaintiffs Fail to State a Claim Under the Wiretap Act

The Wiretap Act provides a private right of action against "any person who . . . intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication," 18 U.S.C. §§ 2511(1)(a), 2520(a). However:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C.A. § 2511(2)(d). Simply put, the "interceptor" is *not* liable under the Wiretap Act if it was a party to the communication, or consented to the interception, unless – under what has come to be known as the "crime-fraud exception" – the interception was "for the purpose of committing any criminal or tortious act." *Id.*

---

"redirect the webpage straight to the Facebook profile associated with the FID[.]" Am. Compl. ¶¶ 132-33. However, plaintiffs in *Solomon* made substantially the same allegation, which the court rejected. 136 F.4th at 54-55.

Defendants do not dispute that the Pixel "intercepted" communications between plaintiffs and the NHL. *See* Def. Mem. at 14-18. Instead, they argue that the NHL "was a party to the communication," and that the crime-fraud exception does not apply, because plaintiffs have not plausibly alleged that the communications were "intercepted for the purpose of committing any criminal or tortious act." *Id*.[5] Defendants are correct on both counts.

### 1.     The Party Exemption

Plaintiffs first argue that the NHL's status as a "party to the communications at issue" does not "vitiate[] its liability," because "it was Meta that performed the actual interception." Pl. Opp. at 14. In their pleading, however, plaintiffs clearly allege that both the NHL, which installed the Pixel, and Meta, which furnished it, were interceptors. *Compare* Am. Compl. ¶ 66 ("Plaintiffs' electronic communications with NHL were intentionally *intercepted by NHL* through the tracking methods (namely, the Pixel) that NHL employed on the Team Websites.") *with id*. ¶ 68 ("Meta and NHL used the contents of Plaintiffs' electronic communications with NHL, *intercepted and processed by Meta*, to target Plaintiffs with advertising.") (emphases added).[6] They also allege that defendants consented to the interception. *See*, *e.g.*, *id*. ¶ 56 ("Defendants purposefully included the Pixel on the Team Websites to intercept Plaintiffs' communications and redirect them to Meta to improve the effectiveness of its and Meta's advertising and marketing."). The NHL is therefore entitled to the protection of § 2511(2)(d) unless the crime-tort exception applies. *See Cooper v.*

---

[5] Defendants also argue – relying on the Kletzien Declaration and its exhibits – that plaintiffs consented to the interception. *See* Def. Mem. at 1, 4 n.2, 22-23. I do not reach this issue.

[6] Moreover, as defendants point out, "there is no secondary civil liability under the Federal Wiretap Act." Def. Reply at 4; *see also*, *e.g.*, *Kirch v. Embarq Mgmt. Co.*, 2011 WL 3651359, at *7 (D. Kan. Aug. 19, 2011) ("The civil liability provision of the [Federal Wiretap Act] … does not provide for secondary liability, as liability attaches only to the party that actually intercepted a communication."), *aff'd*, 702 F.3d 1245 (10th Cir. 2012). Thus, if the complaint could be fairly read as alleging that the NHL did *not* intercept plaintiffs' communications, that would be reason enough to dismiss their Wiretap Act claim.

*Mount Sinai Health Sys., Inc*., 742 F. Supp. 3d 369, 378 (S.D.N.Y. 2024) (in case arising from Mount Sinai's installation of the Pixel on its website, allegedly leading to disclosure of protected health information, Mount Sinai was "a party to the communications at issue, requiring the crime-tort exception to apply for it be liable").

### 2.    The Crime-Tort Exception

Plaintiffs next argue that they have adequately alleged that the "purpose for the interception was criminal or tortious," because "[t]he NHL acted with intent to share Plaintiffs' PII with third parties for, at a minimum, advertising purposes, in violation of the VPPA." Pl. Opp. at 15. However, "Section 2511(2)(d)'s legislative history and caselaw make clear that the 'criminal' or 'tortious' purpose requirement is to be construed narrowly, covering only acts accompanied by a specific contemporary intention to commit a crime or tort." *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 515 (S.D.N.Y. 2001); *accord Cooper*, 742 F. Supp. 3d at 378. As the Court of Appeals explained in *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010), "If, at the moment he hits 'record,' the offender does not intend to use the recording for criminal or tortious purposes, there is no violation. But if, at the time of the recording, the offender plans to use the recording to harm the other party to the conversation, a civil cause of action exists under the Wiretap Act."

Additionally, the interception must be done "for the purpose of a tortious or criminal act that is independent of the intentional act of recording," *Caro*, 618 F.3d at 100 ("A simultaneous tort arising from the act of recording itself is insufficient."), and "the crime or tort must have been the 'primary motivation' or 'a determinative factor' for the defendant's conduct." *Cooper*, 742 F. Supp. 3d at 378 (quoting *In re DoubleClick*, 154 F. Supp. 2d at 514-15). Thus, "'the focus is not upon whether the interception itself violated another law; it is upon whether the purpose for interception – its intended use – was criminal or tortious[.]'" *In re DoubleClick*, 154 F. Supp. 2d at 516 (quoting *Sussman v. ABC,* 186 F. 3d 1200, 1202 (9th Cir. 1999)); *see also United States v.*

17

*Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (the "carve-out within § 2511(2)(d) . . . is confined to instances where the recording party intends to use the recording to harm or injure a recorded party, such as to blackmail, threaten, or publicly embarrass the recorded party"); *Cooper*, 742 F.3d at 378 ("[T]he defendant must have a criminal or tortious purpose at the time of the interception that is 'independent of the act of recording itself.'") (quoting *Caro*, 618 F.3d at 100).

Plaintiffs argue that the § 2511(d)(2) "carve-out" applies here because the Amended Complaint alleges "that the NHL used Meta's tools to intercept the NHL's communications with Plaintiffs, resulting in violations of the VPPA and an intrusion into Plaintiffs' seclusion." Pl. Opp. at 15. In fact – as shown above – plaintiffs have not alleged any cognizable violation of the VPPA. Nor have they stated a claim for intrusion upon seclusion, because – as shown below – there is no such tort in New York. *See Brown v. Learfield Commc'ns, LLC*, 2024 WL 3676709, at *5 (W.D. Tex. June 27, 2024) ("[T]he Court has already dismissed the VPPA claims. Therefore, there is no underlying criminal or tortious act to meet the exception.").

Even if plaintiffs successfully alleged an intrusion-upon-seclusion claim under common law (or under WESCA), that would not make the crime-tort exception applicable, because intrusion-upon-seclusion torts are complete when the interception occurs, and thus are insufficiently "independent" of the Wiretap Act violation. *See Caro*, 618 F.3d at 100-01 (affirming dismissal of Wiretap Act claim because the only tort identified by plaintiff was "[i]nvasion of privacy through intrusion upon seclusion" under Connecticut law, which "presents a problem for Caro" because "it is a tort that occurs through the act of interception itself"); *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 145 (3d Cir. 2015) (affirming dismissal because, although plaintiffs alleged that defendants violated "California laws related to intrusion upon seclusion," that tort "'occurs through the act of interception itself,'" and plaintiffs pled "no

tortious or criminal use of the acquired internet histories") (quoting *Caro*, 618 F.3d at 101); *Berk v. JPMorgan Chase Bank, N.A.*, 2011 WL 6210674, at *3 (E.D. Pa. Dec. 13, 2011) ("Berk's allegation of the recorded telephone conversation with Russell may on its own state a claim for intrusion upon his seclusion under Pennsylvania law, but it does not create liability under the Federal Wiretap Act because it fails to satisfy the independent tortious intent requirement."). Consequently, plaintiffs cannot rely upon either their VPPA claim or their state-law intrusion-upon-seclusion claims to supply the tortious or criminal "purpose," "independent of the intentional act of recording," that is required before they can pursue a Wiretap Act claim under the crime-fraud exception. *Caro*, 618 F.3d at 100.

Plaintiffs are correct that the existence of a "pecuniary motive" will not insulate a defendant from civil liability under the Wiretap Act, if the elements of the violation are otherwise present. Pl. Opp. at 17; *see also*, *e.g.*, *Cooper*, 742 F. Supp. 3d at 382 ("Mount Sinai's broad theory that the presence of a primary financial motive inoculates a defendant from liability under the [Wiretap Act] is wrong.").[7] By the same token, however, the existence of a profit motive does not make otherwise lawful conduct tortious. This case is thus distinguishable from *Cooper* – and from the other HIPAA cases cited in plaintiffs' brief – which permitted Wiretap Act claims to proceed based on allegations that the defendants disclosed the intercepted information in violation of HIPAA, which criminalizes such conduct and prescribes enhanced penalties if the violation is committed

---

[7] In *Cooper*, the court permitted a Wiretap Act claim to proceed against Mount Sinai based on allegations that after intercepting its patients' "individually identifiable health information" through the use of the Pixel, it intentionally disclosed that information to third parties in violation of HIPAA, which not only makes it a crime to disclose such information but prescribes "enhanced penalties when such was done for, *inter alia*, a 'commercial advantage' or 'personal gain.'" 742 F. Supp. 3d at 382.

for commercial advantage.[8] Moreover, unlike the plaintiffs in *R.C. v. Walgreen Co*., 733 F. Supp. 3d 876 (C.D. Cal. 2024), who alleged that Walgreens tracked, collected, and then disclosed, for marketing purposes, the names of the "sensitive healthcare products" they purchased (including "Plan B, HIV tests, pregnancy tests, prenatal vitamins, hyperglycemic/hypoglycemic management products and numerous other products to diagnose and/or treat highly sensitive and private conditions"), *id*. at 886, plaintiffs here identify no particular harm flowing from the potential disclosure of which hockey highlight reels they watched. Thus, the allegation that the NHL had a "business arrangement with Meta, which reveals the NHL's intent to profit commercially from exploiting PII," does not rescue their Wiretap Act claim in the absence of a valid VPPA claim.

Since plaintiffs have failed to allege facts sufficient to invoke the crime-fraud exception, their Wiretap Act claim should be dismissed. Moreover, although plaintiffs suggest that they could strengthen their allegations concerning "evidence of off-site activity or the sharing of user information from the Website to third parties," *see* Pl. Opp. at 27, they do not explain what *facts* they could present to plausibly allege that the interception was done for a criminal or tortious purpose. Therefore, leave to amend should be denied as to this claim as well.

## C.    Under New York Law, Plaintiffs' State Law Claims Also Fail

The fate of plaintiffs' state-law claims hinges largely on whether they are evaluated under New York law – as defendants urge – or under the laws of the various states where the plaintiffs reside, which is the approach championed by plaintiffs. The parties agree that, in order to determine

---

[8] *See, e.g.*, *Kane v. Univ. of Rochester*, 2024 WL 1178340, at *7 (W.D.N.Y. Mar. 19, 2024) ("Plaintiffs have plausibly alleged that Defendant's purpose was to commit an act that is punishable as a crime under 42 U.S.C. § 1320d-6: knowingly disclosing IIHI [Individually Identifiable Health Information] without authorization for marketing purposes."); *Castillo v. Costco Wholesale Corp.*, 2024 WL 4785136, at *7 (W.D. Wash. Nov. 14, 2024) ("Plaintiffs plausibly allege that the crime-tort exception applies because Costco violated HIPAA.").

which states' substantive laws apply, this Court must apply New York's choice-of-law rules. *See* Def. Mem. at 18; Pl. Opp. at 18; *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012) (*Licci I*) ("A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state.") (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989)); *GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006) ("A federal court exercising diversity jurisdiction must apply the choice of law analysis of the forum state."); *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 135 (S.D.N.Y. 2014) ("As a federal court sitting in diversity pursuant to the Class Action Fairness Act of 2005, . . . this Court applies the choice-of-law rules of the state in which the Court sits, namely New York.") (internal quotation marks and citation omitted)

The parties further agree that there is an "actual conflict between the laws of the jurisdictions involved," *Licci I*, 672 F.3d at 157 (quoting *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415 (2d Cir. 2006)). *See* Def. Mem. at 20; Pl. Opp. at 19. New York (unlike Pennsylvania, Illinois, and Nevada) does not recognize the tort of "intrusion upon seclusion." *See Poppel v. Est. of Archibald,* 2020 WL 2749719, at *9 (S.D.N.Y. May 27, 2020) ("New York has consistently refused to recognize a common law right of privacy, and hence there is no cause of action of intrusion upon seclusion under New York law.") (quoting *Hamlett v. Santander Consumer USA Inc.*, 931 F. Supp. 2d 451, 457 (E.D.N.Y. 2013)); *Moore v. Sam's Club, a Div. of Wal-Mart Stores, Inc.*, 55 F. Supp. 2d 177, 186 (S.D.N.Y. 1999) ("New York does not recognize a common law claim for invasion of privacy such as intrusion on seclusion.").

Further, although both New York and Pennsylvania have enacted statutes prohibiting unauthorized wiretapping, New York is a "one party consent" state, *see* N.Y. Penal Law § 250.00(1); *Locke v. Aston*, 31 A.D.3d 33, 35, 814 N.Y.S.2d 38, 40 (1st Dep't 2006) ("[I]n New

York, as in a majority of the states and under federal law, a telephone conversation may be taped as long as one party to the conversation consents to the taping[.]"), whereas Pennsylvania permits interception (outside of the law enforcement context) only where "all parties to the communication have given prior consent to such interception." 18 Pa. C.S. § 5704(4). Moreover, the New York statute does not provide for a private right of action. *See Grasso v. Grasso, Jr.*, 2010 WL 3806388, at *10 (N.D.N.Y. Sept. 22, 2010) ("New York does not provide for any private right of action for an alleged illegal wiretap."), *reconsidered in part on other grounds sub nom. Grasso v. Est. of Grasso*, 2010 WL 5441910 (N.D.N.Y. Dec. 27, 2010); *accord Boucher v. Dilorenzo*, 1986 WL 2409, at *4 (S.D.N.Y. Feb. 19, 1986). Consequently, "if New York law applies, Plaintiffs' WESCA and intrusion upon seclusion claims fail." Def. Reply at 7.

Where a conflict exists, New York utilizes an "interest analysis" to determine which state's substantive law applies. *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 197, 491 N.Y.S. 2d 90, 95 (1985). Under this approach, "[t]he law of the jurisdiction having the greatest interest in the litigation will be applied." *GlobalNet*, 449 F.3d at 384 (alteration in original). The analysis is meant to be "flexible," *Howard Univ. v. Borders*, 588 F. Supp. 3d 457, 471 (S.D.N.Y. 2022), with the goal of applying "the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *Id.* (quoting *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006)).

"[T]he interest analysis is applied differently depending on whether the rules in question are conduct-regulating rules that 'people use as a guide to governing their primary conduct,' or loss-allocating rules that 'prohibit, assign, or limit liability after the tort occurs.'" *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 49 (2d Cir. 2013) (*Licci II*) (quoting *Licci I*, 672 F.3d at 158). "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where

the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *GlobalNet*, 449 F.3d at 384 (quoting *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72, 612 N.E.2d 277 (1993)). If, instead, "the conflict involves allocation of losses, the site of the tort is less important, and the parties' domiciles are more important." *Id.* at 384-85.

In order to determine "where the tort occurred," in cases involving conduct-regulating laws, courts in New York look to the place where the defendants engaged in the allegedly unlawful conduct. "In the ordinary tort case, 'both the wrong and the injury t[ake] place' in the same jurisdiction." *Licci II*, 739 F.3d at 50 (alteration in original) (quoting *Babcock v. Jackson,* 12 N.Y.2d 473, 477 n.2, 240 N.Y.S.2d 743, 746 n.2 (1963)). "But where they do not, it is the place of the allegedly wrongful conduct that generally has superior 'interests in protecting the reasonable expectations of the parties who relied on [the laws of that place] to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future.'" *Id.* at 50-51 (alteration in original) (quoting *Schultz,* 65 N.Y.2d at 198, 491 N.Y.S.2d at 96); s*ee also Licci I,* 672 F.3d at 158 (applying New York law where "[a]ll of the challenged conduct undertaken by AmEx occurred in New York, where AmEx is headquartered and where AmEx administers its correspondent banking services. Although the plaintiffs' injuries occurred in Israel, and Israel is also the plaintiffs' domicile, those factors do not govern where, as here, the conflict pertains to a conduct-regulating rule."); *AHW Inv. P'ship, MFS, Inc. v. Citigroup Inc.*, 661 F. App'x 2, 5 (2d Cir. 2016) (although plaintiffs' injuries were in Florida, New York law was properly applied because "the allegedly wrongful conduct – the misrepresentations by Citigroup and its officers – took place in New York, where Citigroup had its headquarters."); *Holborn Corp. v. Sawgrass Mut. Ins. Co*., 304 F. Supp. 3d 392, 399 (S.D.N.Y. 2018) (Nathan, J.) ("The Court concludes that it must

follow the decision in [*Licci II*] and presume that the state with the greatest interest in this case is the state in which the alleged wrongful conduct occurred.")

Here, the parties agree that both of plaintiffs' state law claims – for intrusion upon seclusion and violation of WESCA – arise under "conduct regulating" laws, *see* Def. Mem. at 19; Pl. Opp. at 19, calling for the application of "the law of the jurisdiction where the tort occurred." *GlobalNet*, 449 F.3d at 384; *see also Poppel*, 2020 WL 2749719, at *9 ("The Parties also agree that the alleged tort [intrusion upon seclusion] in this case is a conduct regulating rule."); *Grasso*, 2010 WL 3806388, at *10 (holding that Florda's wiretap statute is conduct-regulating). However, they disagree as to "where the tort occurred." Plaintiffs argue that "the place of the tort is the location of users' computers when they were compelled to intercept, duplicate, and reroute Plaintiffs' and Pennsylvania Subclass Members' communications." Pl. Opp. at 19. Thus, in plaintiffs' view, their "state law claims, including WESCA and intrusion upon seclusion, are analyzed under the substantive law of the states where Plaintiffs used the Team Websites." *Id*. at 20. Defendants contend that New York is "the place of the alleged tort," because, "[a]ccording to the Amended Complaint, the NHL's allegedly wrongful conduct (i.e. placement of the Pixel) occurred in New York." Def. Reply at 8.

Defendants have the better end of the argument. Their allegedly tortious conduct – that is, the conduct that the relevant state laws seek to regulate – was the placement of the Pixel on the NHL Website and the Team Websites. *See* Am. Compl. ¶ 10 ("Defendants purposefully implemented and utilized the Pixel, which tracks user activity on the Team Websites and discloses that information to Facebook to gather valuable marketing data. The Pixel cannot be placed on the Websites without steps taken directly by Defendants or on behalf of Defendants (e.g., by a website manager)."); *id*. ¶ 16 ("Defendants purposefully implemented and utilized the Pixel to intercept,

24

read, and disclose the content consumed by Subscribers, as well as the precise location of the webpages visited by Subscribers."); *id.* ¶¶ 111-113 ("To add an operational Pixel to a website, the website owner or operator must take several affirmative steps, including naming the Pixel during the creation and setup of the Pixel. Once the Pixel is created, the website operator assigns access to the Pixel to specific people for management purposes, and must connect the Pixel to a Facebook Ad account. After following these steps, a website operator can start capturing and sharing information using the Pixel."); *id.* ¶ 116 ("Defendants undertook each of these necessary steps to add the Pixel to each of the Team Websites[.]"); *id.* ¶ 190 ("Through its placement of Pixel on the Team Websites, Defendants enabled this interception and resulting intrusion upon Plaintiffs' and Nationwide Class Members' privacy."); *id.* ¶ 197 ("by implementing the Pixel on the Team Websites, Defendants intentionally invaded Plaintiffs' and Nationwide Class Members' privacy rights, and procured Meta to do so."); *id.* ¶ 222 ("NHL procured Meta's services to 'intercept' Plaintiff Nam's and Pennsylvania Subclass members' communications with NHL[.]").

This conduct, according to plaintiffs, took place at defendants' headquarters in New York. *See* Am. Compl. ¶ 32 ("Defendants conduct substantial business operations in this District. In connection with the Team Websites, the video content, hosting of media accessible to Subscribers, *and associated coding*, all *originate and arise out of the Defendants' business operations in this District*.") (emphasis added). Thus, it is New York which has a superior interest "in protecting the reasonable expectations of the parties who relied on [its law] to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future." *Schultz,* 65 N.Y.2d at 198, 491 N.Y.S.2d at 96.

Plaintiffs may be correct that the actual interception (and hence, any injury to plaintiffs) took place wherever plaintiffs used their computers to watch NFL videos.[9] However, the Second Circuit, applying New York law, has decisively rejected the view "that the law of the place of injury ordinarily or always governs where conduct-regulating rules are involved," holding instead that where the defendant's wrongful conduct and the plaintiff's injuries occur in different states, "it is the place of the allegedly wrongful conduct that generally has superior interests" in applying its law. *Licci II*, 739 F.3d at 50-51. I therefore conclude (as Judge Nathan did in *Holborn*), that this Court must follow the decision in *Licci II* and "presume that the state with the greatest interest in this case is the state in which the alleged wrongful conduct occurred." *Holborn*, 304 F. Supp. 3d at 399. Moreover, the Amended Complaint makes it clear that once the Pixel is installed, the interception process is automatic. *See* Am. Compl. ¶ 93 (Facebook's "Business Tools," including the Pixel, "collect and transmit the data automatically"); *id.* ¶ 177 (disclosure of plaintiffs' PII is "triggered automatically through Defendants' use of the Pixel. No additional steps on the part of the Defendants, Facebook, or any third-party are required"). Thus, plaintiffs' injuries, if any, were caused by "behavior within [New York's] borders," *GlobalNet*, 449 F.3d at 384, reinforcing the conclusion that New York has a stronger interest than Pennsylvania, Illinois, or Nevada in applying its law to that behavior.

---

[9] Plaintiffs cite three out-of-Circuit cases for this proposition, none of which applied New York's choice-of-law rules. *See Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 132 (3d Cir. 2022) ("the place of interception is the point at which the signals were routed to [defendant's] servers"); *Epstein v. Epstein*, 843 F. 3d 1147, 1150 (7th Cir. 2016) (holding the interception of plaintiff's emails occurred when they were copied "at the server," not when the wrongdoer received them); *Arndt v. Govt' Emps. Ins. Co.*, 750 F. Supp. 518, 525 n.2 (D. Md. 2024) (using Maryland choice-of-law rules to apply "the substantive law of the state of the place of harm," which was Pennsylvania, because plaintiff "was in Pennsylvania when he accessed Defendant's website") (internal quotation marks and citation omitted).

Because New York law applies to both of plaintiffs' state law claims, and because New York does not recognize the tort of intrusion upon seclusion or permit private civil suits for wiretapping, both of those claims should be dismissed. In this case, amendment would be futile because the state law claims fail as a matter of law, rather than due to insufficient factual allegations.

## IV.    CONCLUSION

For the reasons set forth above, I recommend, respectfully, that defendants' motion to dismiss (Dkt. 44) be GRANTED and that all of plaintiffs' claims be dismissed, pursuant to Rule 12(b)(6), without leave to amend.

Dated: New York, New York
      August 29, 2025

**BARBARA MOSES**
**United States Magistrate Judge**

## NOTICE OF PROCEDURE FOR FILING OF
## OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Lewis A. Kaplan at 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned magistrate judge. Any request for an extension of time to file objections must be directed to Judge Daniels. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review**. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x, 486, 487 (2d Cir. 2018) (summary order); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).